McGREGOR–DONIGER INC.,
Plaintiff-Appellant,

v.

DRIZZLE INC., Defendant-Appellee.

No. 10, Docket 78–7132.

United States Court of Appeals,
Second Circuit.

Argued Nov. 6, 1978.

Decided April 11, 1979.

Henry L. Shenier, New York City (William A. Kinnaman, Jr., Shenier & O'Connor, New York City, of counsel), for plaintiff-appellant.

Robert W. Fiddler, New York City (Fiddler & Levine, New York City, of counsel), for defendant-appellee.

Before FRIENDLY, MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

McGregor-Doniger Inc. ("McGregor"), a New York corporation founded in 1921, is a manufacturer of apparel for both men and women. Since 1947 McGregor has sold golf jackets under the trademark DRIZZLER, and in 1965 the company registered this mark for use in connection with golf jackets. Although McGregor had in the past used the word DRIZZLER in connection with other types of apparel, by 1965 the company had ceased using the mark in connection with any goods other than golf jackets. McGregor owns a variety of other trademarks, such as BROLLY DOLLY and BERNHARD ALTMANN, which have been used in connection with goods other than golf jackets. DRIZZLER jackets sell for about $25 to $50.

Drizzle Inc. ("Drizzle"), a New York corporation established in 1969, sells only women's coats. Drizzle's coats, which are manufactured for Drizzle by various contractors, have been sold under the unregistered trademark DRIZZLE since the founding of the company. It appears from the record that Drizzle has to date employed no other trademark. DRIZZLE coats range in price from about $100 to $900.

In 1974 McGregor's management first became aware of the Drizzle company and of its use of the DRIZZLE mark in connection with the sale of women's coats. In January of 1975 McGregor notified Drizzle that if use of the DRIZZLE trademark on Drizzle's goods continued, legal proceedings would be instituted. The warning went unheeded and in March of 1975 McGregor brought suit against Drizzle in the United States District Court for the Southern District of New York, alleging trademark infringement, 15 U.S.C. § 1114,[1] false designation of

---

1. 15 U.S.C. § 1114(1) provides in part:
 Any person who shall, without the consent of the registrant—
 (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale,

offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
 (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply

origin, 15 U.S.C. § 1125(a),[2] and, in a pendent claim, common law unfair competition.[3] McGregor sought an injunction barring Drizzle's further use of DRIZZLE as a trademark, an accounting for profits, damages, and other relief.

After a two-day bench trial, Judge Morris E. Lasker dismissed McGregor's complaint. 446 F.Supp. 160 (S.D.N.Y.1978). On appeal, McGregor challenges both the factual findings of the trial court and the trial court's interpretation of the legal significance of the facts found. Although the trial court's statement of the applicable principles needs modification, we conclude that reversal is not warranted.

## DISCUSSION

 We are once again called upon to decide when a trademark owner will be protected against the use of its mark, or one very similar, on products other than those to which the owner has applied it. *See, e. g., Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1169 (2d Cir. 1976). As we have observed before, the question "does not become easier of solution with the years." *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

The crucial issue in these cases is "whether there is any likelihood that an apprecia-

ble number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 84, at 929 (3d ed. 1969) (hereinafter Callman); Restatement of Torts § 717 and Comment b at 567 (1938). In assessing the likelihood of such confusion we consider the factors laid out in the now classic *Polaroid* formula:

> Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

*Polaroid Corp. v. Polarad Electronics Corp., supra,* 287 F.2d at 495, *citing* Restatement of Torts §§ 729, 730, 731. *Accord, Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 47; *Scarves by Vera, Inc.*

such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

The federal courts have jurisdiction of such actions without regard to amount in controversy or diversity of citizenship. 15 U.S.C. § 1121.

**2.** 15 U.S.C. § 1125(a) provides:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall

cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The district courts have jurisdiction of such actions under 28 U.S.C. § 1338(a).

**3.** 28 U.S.C. § 1338(b) provides in part:

The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the . . . trade-mark laws.

*v. Todo Imports Ltd., supra,* 544 F.2d at 1173; *King Research, Inc. v. Shulton, Inc.,* 454 F.2d 66, 68 (2d Cir. 1972); *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1099 (2d Cir. 1969), *cert. dismissed,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970); *Triumph Hosiery Mills, Inc. v. Triumph Internat'l Corp.,* 308 F.2d 196, 198 (2d Cir. 1962); *cf.* Callman § 80.5, at 556–57. The parties agree that Judge Lasker was correct in giving consideration to each of the factors mentioned in *Polaroid* before reaching a decision on the ultimate question of likelihood of confusion.

(1) *Strength of the Mark*

The most complex issue raised by McGregor concerns the trial court's attempt to gauge the strength of the DRIZZLER mark. Our prior opinions and those of the district courts of this Circuit have left litigants and judges uncertain as to the appropriate way to demonstrate and determine the strength of a mark. In the hope of providing some guidance to bench and bar, we set out in some detail our view of this issue.

■ The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source. *E. I. DuPont de Nemours & Co. v. Yoshida Internat'l, Inc.,* 393 F.Supp. 502, 512 (E.D.N.Y.1975); Callman § 82.1(1), at 755. The Restatement of Torts uses the term "distinctiveness" in place of the term "strength." § 731(f) and Comment e at 602. The strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protection it will be accorded.

■ In an effort to liberate this aspect of trademark law from the "welter of adjectives" which had tended to obscure its contours, we recently reviewed the four categories into which terms are classified for trademark purposes. *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976). Arranged in ascending order of strength, these categories are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. A generic term can never become a valid trademark and cannot be registered. A descriptive term can be registered as a mark only if it has "become distinctive of the applicant's goods in commerce," 15 U.S.C. § 1052(f), that is, in the unfortunate parlance of the cases, only if it has acquired "secondary meaning." Suggestive marks, falling between the merely descriptive and the arbitrary or fanciful, are entitled to registration without proof of secondary meaning, as are fully arbitrary or fanciful terms. 537 F.2d at 9–11. The boundaries between these categories are not fixed.

> [A] term that is in one category for a particular product may be in quite a different one for another, because a term may shift from one category to another in light of differences in usage through time, because a term may have one meaning to one group of users and a different one to others, and because the same term may be put to different uses with respect to a single product.

*Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 9 (footnotes omitted).

Thus, while these categories can be useful for analytical purposes, the strength of a mark depends ultimately on its distinctiveness, or its "origin-indicating" quality, in the eyes of the purchasing public. Two familiar examples suffice to illustrate this principle. A coined term, initially suggestive or even fanciful, can lose its full trademark status if it comes to signify to the public the generic name of an article rather than the source of a particular brand of that article. *See, e. g., King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F.2d 577 (2d Cir. 1963) ("thermos"); *Haughton Elevator Co. v. Seeberger,* 85 U.S.P.Q. (BNA) 80 (Dec.Com.Pat.1950) ("escalator"). In contrast, a descriptive mark that is not distinctive on its face may acquire secondary meaning so as to identify the source of the goods and thus claim status as a valid mark deserving of registration and protec-

**1132**

tion against infringement. *See, e. g., W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir. 1970) ("Trim" manicure implements). In Judge Lasker's words, "strength may derive from the intrinsic quality of a mark or from its public history." 446 F.Supp. at 162.

 The many cases announcing that a mark found to be suggestive, arbitrary or fanciful (*i. e.,* more than merely descriptive) is entitled to protection without proof of secondary meaning are correct as far as they go, for any term that is more than descriptive can be established as a valid mark which others may not infringe. Where the products involved are competitive and the marks quite similar, for example, the senior user of a more-than-descriptive mark need not prove secondary meaning. *See, e. g., American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 106 (2d Cir. 1978) (fanciful mark for insect traps; "Roach Inn" held to infringe "Roach Motel"). And where the marks involved are virtually identical, even if the products are non-competitive, a senior user of a more-than-descriptive mark can carry its burden on the "strength of the mark" component of the *Polaroid* formula without proving secondary meaning. *See, e. g., Mushroom Makers, Inc. v. R. G. Barry Corp., supra*, 580 F.2d at 48 (arbitrary mark). But these cases do not require us to hold that Judge Lasker erred in considering evidence of secondary meaning in determining whether McGregor is entitled to protection against the use, on non-competitive goods, of a mark similar to its own. The cases agree that it is appropriate to consider all factors bearing on the likelihood of confusion. We view evidence concerning the origin-indicating significance of a mark in the marketplace as relevant to and probative of the strength of a mark and hence useful in assessing the likelihood of confusion.

 Consideration of evidence of secondary meaning will almost always work in favor of the senior user. Its mark, if registered, is presumptively distinctive. *See Abercrombie & Fitch Co. v. Hunting World,*

*Inc., supra*, 537 F.2d at 11. Proof of secondary meaning, acquired perhaps through successful advertising, can only enhance the strength of its mark and thus enlarge the scope of the protection to which it is entitled. On the other hand, the owner of a distinctive mark need not introduce evidence of secondary meaning in order to gain protection for its mark against the confusing similarity of others. Thus, for example, the relatively small size of a senior user's advertising budget or sales volume will not diminish the strength of its valid mark, and the scope of protection accorded to that mark will not be narrowed because of such evidence. *Mushroom Makers, Inc. v. R. G. Barry Corp., supra*, 580 F.2d at 48. Only if the junior user carries the burden of affirmatively demonstrating that a term is generic is the senior user stripped of protection. *Abercrombie & Fitch Co. v. Hunting World, Inc., supra*, 537 F.2d at 9–10; 15 U.S.C. § 1064(c).

 McGregor claims that the district court erred in requiring proof of secondary meaning. We agree with McGregor's contention that the decision of the Patent and Trademark Office to register a mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is more than merely descriptive. *Abercrombie & Fitch Co. v. Hunting World, Inc., supra*, 537 F.2d at 11; *West & Co. v. Arica Institute, Inc.*, 557 F.2d 338, 342 (2d Cir. 1977). The trial court did in fact find the term DRIZZLER more than merely descriptive, although apparently only barely over the "suggestive" line. As a suggestive term, the DRIZZLER mark would be entitled to protection, regardless of proof of secondary meaning, *if* McGregor could prove that confusion of origin was likely to result from the use of a similar mark on non-competing goods. To the extent the district court held proof of secondary meaning *necessary,* it was in error. However, it was *not* error for the court to consider evidence bearing on the strength of the mark in determining the likelihood of consumer confusion and thus the scope of protection to which the DRIZZLER mark was

entitled.[4] Trademark strength is "an amorphous concept with little shape or substance when divorced from the mark's commercial context," *E. I. DuPont de Nemours & Co. v. Yoshida Internat'l, Inc., supra,* 393 F.Supp. at 512. We see no advantage to be derived from barring judicial consideration of the realities that give content to the concept of trademark strength.

## (2) *Similarity of the Marks*

■ "To the degree that the determination of 'likelihood of confusion' rests upon a comparison of the marks themselves, the appellate court is in as good a position as the trial judge to decide the issue." *Miss Universe, Inc. v. Patricelli,* 408 F.2d 506, 509 (2d Cir. 1969). *Accord, Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.,* 428 F.2d 379, 380 (2d Cir. 1970); *Miles Shoes, Inc. v. R. H. Macy & Co.,* 199 F.2d 602, 602–03 (2d Cir. 1952), *cert. denied,* 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953). There are two principles especially important to performing this task.

First, even close similarity between two marks is not dispositive of the issue of likelihood of confusion. "Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question." Callman § 82.1(a), at

601–02 (footnote omitted). For this reason cases involving the alteration, addition or elimination of only a single letter from the old mark to the new reach divergent results. *E. I. DuPont de Nemours & Co. v. Yoshida Internat'l, Inc., supra,* 393 F.Supp. at 511–12. Second, in assessing the similarity of two marks, it is the effect upon prospective purchasers that is important. Restatement of Torts § 728, Comment b at 591.

■ The district court quite correctly took into consideration all the factors that could reasonably be expected to be perceived by and remembered by potential purchasers. "[T]he setting in which a designation is used affects its appearance and colors the impression conveyed by it." *Id.* § 729 Comment b at 593. Thus while observing that the typewritten and aural similarity of the two marks "approaches identity," the district judge noted that the context in which the respective marks are generally presented reduces the impact of this similarity. The court observed that the label in each DRIZZLER jacket prominently features the McGregor name, which is printed in striking plaid letters. In addition, although there was testimony that retail stores on occasion in independent advertisements omit the McGregor logo, the evi-

---

4. Perhaps anticipating our decision that the trial court properly considered evidence of secondary meaning, McGregor takes the fallback position that the trial court erred in commenting that, as a matter of law, evidence of sales figures and advertising expenditures was insufficient to establish secondary meaning. Whether secondary meaning has attached to a trademark is a factual question and we see no reason to adopt an inflexible rule that would unnecessarily restrict the ability of trial courts to determine the sufficiency of the evidence introduced to establish the existence of secondary meaning. In any case, the district court's comment was not relevant to the decision of the case. It is clear from the opinion below that Judge Lasker considered evidence beyond bare advertising and sales figures—including many exhibits illustrating the nature of McGregor's advertising and labeling practices.

We cannot say that Judge Lasker's finding on the secondary meaning question is clearly erroneous. As Judge Weinfeld noted in the district court opinion in the *Mushroom Makers* case, 441 F.Supp. 1220, 1227 n. 27 (S.D.N.Y.1977),

advertising and sales figures are open to varying interpretations. *See also Exquisite Form Indus., Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403, 411 (S.D.N.Y.1974) ("mere showing of advertising does not provide a basis for determining the extent of customer awareness of a mark"); *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 134 (S.D.N.Y. 1972). Thus, while an "inference of secondary meaning, properly supported" may be enough, *W. E. Bassett Co. v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir. 1970); *cf. Roux Laboratories, Inc. v. Clairol Incorporated,* 427 F.2d 823, 827–29, 57 C.C.P.A. 1173 (1970) (advertising campaign as circumstantial evidence of distinctiveness), evidence concerning attempts to popularize a mark is not conclusive. Clearly a trademark owner makes a stronger showing as to the strength of his mark if he offers evidence probative of the effectiveness of his efforts. *See, e. g., Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1170, 1173 (2d Cir. 1976) (many articles written about plaintiff's growth and products indicated recognition in industry).

dence showed that McGregor always emphasizes the company name in its own advertising of DRIZZLER jackets. The fact that a trademark is always used in conjunction with a company name may be considered by the trial court as bearing on the likelihood of confusion. *Warner Brothers Co. v. Jantzen, Inc.,* 249 F.2d 353, 354 (2d Cir. 1957); *Daggett & Ramsdell, Inc. v. I. Posner, Inc.,* 47 C.C.P.A. 952, 277 F.2d 952, 953–54 (1960).

 The law does not require that trademarks be carefully analyzed and dissected by the purchasing public. "[I]t is sufficient if the *impression* which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trade-mark." *Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 494 (S.D.N.Y.1968) (footnote omitted; emphasis added). The court below properly focused on the general impression conveyed by the two marks. If Drizzle had chosen consistently to present its mark in red plaid lettering or to advertise its coats as the McGregor DRIZZLE line, we would be compelled to conclude that the similarity between the DRIZZLER mark and the DRIZZLE mark, *as generally presented to the public,* had been heightened and that the likelihood of confusion had been enhanced. Conversely, the fact that only one mark generally appears in close conjunction with the red plaid McGregor name increases the likelihood that the public, even when viewing the marks individually, will not confuse the two. *See Grotrian, Helfferich, Schulz, Etc. v. Steinway & Sons,* 523 F.2d 1331, 1339 (2d Cir. 1975) (appropriate for court to consider differences in typeface of two marks). *See also American Home Products Corp. v. Johnson Chemical Co., supra,* at 107–08 (test should be customer reaction to products presented individually). *Accord, Union*

*Carbide Corp. v. Ever-Ready Inc.,* 531 F.2d 366, 382 (7th Cir.), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Carlisle Chemical Works, Inc. v. Hardman & Holden Ltd.,* 58 C.C.P.A. 751, 434 F.2d 1403, 1406 (1970). The likelihood of confusion is further reduced by Drizzle's use of its mark to identify itself as the producer of the products advertised by it rather than as the name of a particular jacket or line of jackets, in contrast to McGregor's practice.

The district court's reasoning is sound. The differing methods of presentation of the two marks were properly examined. We agree with Judge Lasker's appraisal that they reduce to some degree the potential for confusion inherent in the close similarity between the two marks.

(3) and (4) *Product Proximity and Quality of Defendant's Product*

 The district court concluded on the basis of differences in appearance, style, function, fashion appeal, advertising orientation, and price [5] that the competitive distance between DRIZZLER jackets and DRIZZLE coats is "significant." This conclusion is too amply supported by the evidence to be characterized as clearly erroneous.

McGregor does not claim that DRIZZLER jackets and DRIZZLE coats are directly competitive. Customers shopping for an inexpensive golf jacket are not likely to become confused by the similarity of the marks and mistakenly purchase a fashionable and expensive woman's coat. Thus the degree of proximity between the two products is relevant here primarily insofar as it bears on the likelihood that customers may be confused as to the *source* of the products, rather than as to the products themselves, and the concern is not direct diversion of purchasers but indirect harm through loss of goodwill or tarnishment of

---

5. While difference in price may, when standing alone, be insufficient to establish competitive distance, it is clearly a factor to be considered along with others in measuring product proximity. *Cf. Chester Barrie, Ltd. v. The Chester Laurie, Ltd.,* 189 F.Supp. 98, 101 (S.D.N.Y.

1960). At the time of trial most DRIZZLER jackets sold for approximately $25, although a lined model was available for about $50. Retail prices of DRIZZLE coats ranged from about $100 to $900 during that same period of time.

reputation. Restatement of Torts § 730, Comment b at 599. It is evident that customers would be more likely to assume that DRIZZLER golf jackets and DRIZZLE golf jackets come from the same source than they would be likely to assume that DRIZZLER golf jackets and DRIZZLE steam shovels come from the same source. DRIZZLE coats for women fall between the two extremes. In locating the appropriate place for DRIZZLE coats on this continuum, the district court considered many of the factors that are generally viewed as relevant.

The impression that noncompeting goods are from the same origin may be conveyed by such differing considerations as the physical attributes or essential characteristics of the goods, with specific reference to their form, composition, texture or quality, the service or function for which they are intended, the manner in which they are advertised,' displayed or sold, the place where they are sold, or the class of customers for whom they are designed and to whom they are sold.

Callman § 82.2(c), at 807.

Looking at these very factors, the district judge found:

Beyond the fact that they might both be crudely classified as outerwear, the "DRIZZLER" and defendant's products have nothing in common. McGregor's garment is a relatively inexpensive, lightweight, waist-length . jacket—a windbreaker . . . . As is apparent from advertisements for the jacket, it is intended for casual wear, particularly in connection with sports activities. Moreover, although the DRIZZLER can be worn by either men or women, sales are pitched primarily to the former . . . . Furthermore, a DRIZZLER is ordinarily sold in the men's department of stores which carry both men's and women's garments . . . . .

Unlike McGregor's products, the coats manufactured by Drizzle are . distinctly and exclusively tailored for women. They are generally full-length raincoats and capes. Although it is true that Drizzle manufactures a style that might be

called a jacket . . . it is longer than the DRIZZLER and entirely different in appearance. Drizzle's garments are within the medium to high fashion range . . . . The price range of Drizzle's line, running from approximately $100 to $900 . . . reflects the coats' position in the fashion hierarchy.

446 F.Supp. at 164 (footnotes and citations to record omitted).

In *Blue Bell, Inc. v. Jaymar-Ruby, Inc.,* 497 F.2d 433 (2d Cir. 1974), we recognized that due to diversification in the garment business, men's apparel and women's apparel had in certain cases been regarded as sufficiently related to justify the denial of registration to similar marks. *See, e. g., S. Rudofker's Sons v. Genesco Inc.,* 150 U.S. P.Q. (BNA) 821 (T.T.A.B. 1966) (*After Five* refused registration for women's lingerie on opposition by *After Six* men's formal wear). However, in *Blue Bell* we characterized the proximity between men's sportswear and women's sportswear as only "moderate" and held that the likelihood of confusion was reduced by the rather "detailed purchasing process" appropriate to the goods in question. 497 F.2d at 435–36. We know of no case holding that, as a matter of law, the competitive distance between men's apparel and women's apparel cannot be demonstrated to be significant on the basis of the many factors relevant to such a determination. The district court's finding on this issue, based on the proper indicia and supported by the evidence, should not be disturbed.

The high quality of Drizzle's coats is not contested by McGregor.

*(5) Bridging the Gap*

In assessing the likelihood of confusion, the district court was required to consider the likelihood that DRIZZLER would "bridge the gap," that is, the likelihood that McGregor would enter the women's coat market under the DRIZZLER banner. *Polaroid Corp. v. Polarad Electronics Corp., supra,* 287 F.2d at 495. McGregor presented no evidence that such a step was being considered. Clearly the absence of

any present intention or plan indicates that such expansion is less, rather than more, probable. Also of probative value is the fact that McGregor has for many years marketed its women's apparel under names bearing no similarity to DRIZZLER—such as BROLLY DOLLY. *See King Research, Inc. v. Shulton, Inc., supra,* 454 F.2d at 68 (manufacturer of brush cleaner under "Ship Shape" mark rated low on likelihood that it would bridge the gap and manufacture hair spray under "Ship Shape" mark where its own sales of toiletries had to date been under other marks). On the other hand, the absence of a present intent to bridge the gap is not determinative. In a given case, sufficient likelihood of confusion may be established although likelihood of bridging the gap is not demonstrated. Because consumer confusion is the key, the assumptions of the typical consumer, whether or not they match reality, must be taken into account. *E. I. DuPont de Nemours & Co. v. Yoshida Internat'l, supra,* 393 F.Supp. at 517–18; *Scarves by Vera, Inc. v. Todo Imports Ltd., supra,* 544 F.2d at 1174 (where "name" designers frequently market women's perfume under same mark as women's apparel, confusion likely if defendant permitted to market perfume under name "Vera"; thus "no need to decide whether there is a substantial likelihood that plaintiff will enter the cosmetics and fragrances market").

■ The district court's finding that it is unlikely that DRIZZLER will bridge the gap is not clearly erroneous. Nor does the evidence presented below regarding McGregor's own history of trademark use, as well as industry custom, compel the conclusion that, despite the improbability that McGregor will move into the women's coat market under the DRIZZLER trademark, consumers will assume otherwise.

**(6) *Actual Confusion***

■ McGregor's claim that the district court erred in considering the absence of proof of *actual* consumer confusion in assessing the *likelihood* of confusion is without merit. Actual confusion is one of several factors to be considered in making such a determination. *Polaroid Corp. v. Polarad Electronics Corp., supra,* 287 F.2d at 495. Although we have recognized the difficulty of establishing confusion on the part of retail customers, the district judge quite properly noted that not a single instance of consumer confusion had actually been demonstrated. *See Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 48. While a plaintiff need not prove actual confusion in order to prevail, *W. E. Bassett Co. v. Revlon, Inc., supra,* 435 F.2d at 661–62; *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., supra,* 411 F.2d at 1100–01; *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.,* 281 F.2d 755, 761 (2d Cir. 1960), "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion." *Affiliated Hosp. Prod., Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183, 1188 (2d Cir. 1975). *Accord Blue Bell, Inc. v. Jaymar-Ruby, Inc., supra,* 497 F.2d at 435–36.

■ Finally, the district court was not required, as McGregor urges, to find actual *consumer* confusion on the basis of the testimony of one McGregor employee that she had been momentarily confused by a DRIZZLE advertisement. The weighing of evidence, particularly where credibility judgments must be made, is for the trial judge. His determination regarding actual confusion is not clearly erroneous.[6]

**(7) *Good Faith***

McGregor contends that the district court improperly placed the burden of proof on

---

6. McGregor's conceded ignorance of Drizzle's existence during the years 1969–1974 would seem to us to further buttress both the trial court's finding that no actual confusion had been proven and its ultimate conclusion that confusion is not likely. *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 364 (2d Cir. 1959). Had customers, suppliers, or middlemen ever misdirected inquiries, complaints, raw materials, or finished goods, presumably the Drizzle company and its mark could not have escaped McGregor's attention for five years.

the good faith issue on McGregor rather than on Drizzle. *See Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., supra,* 411 F.2d at 1101 (placing burden on junior user where allegedly infringing mark was *identical* to that of senior user and both marks were used on women's undergarments). However, assuming without deciding that McGregor is correct in its view of the proper placement of the burden of proof, there is simply no indication in Judge Lasker's opinion that this burden was in fact placed on McGregor.

■ We recently held that adoption of the mark MUSHROOM for women's sportswear despite actual and constructive notice of another company's prior registration of the mark MUSHROOMS for women's shoes was not necessarily indicative of bad faith, because the presumption of an exclusive right to use a registered mark extends only so far as the goods or services noted in the registration certificate. *Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 48, *citing Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 613 n.7 (2d Cir.), *cert. denied,* 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960). *See also Triumph Hosiery Mills, Inc. v. Triumph Internat'l Corp., supra,* 308 F.2d at 199 (innocent junior user is one whose use is not attributable to intent to obtain free ride on reputation of trademark owner). Here, as in *Mushrooom Makers,* the district court was entitled to consider and to credit the uncontradicted testimony of Drizzle's witnesses that the DRIZZLE mark was selected without knowledge of McGregor's prior use of the DRIZZLER mark. "Normally, the alleged infringer's intent is an issue for district court determination," *Grotrian, Helfferich, Schulz, Etc. v. Steinway & Sons, supra,* 523 F.2d at 1338 n.14, and findings as to such intent will be upset only if clearly erroneous. *Miss Universe, Inc. v. Patricelli, supra,* 408 F.2d at 509.

### (8) Sophistication of Buyers

McGregor asserts that the trial court erroneously considered only the typical "sophisticated" purchaser of Drizzle's coats, to the exclusion of the casual or unsophisticated purchaser. We do not read the decision below in this manner.

The relevant cases not only authorize but instruct the trial courts, in making a determination as to likelihood of confusion, to consider the level of sophistication of the relevant purchasers. *See, e. g., Miss Universe, Inc. v. Patricelli, supra,* 408 F.2d at 509; *Polaroid Corp. v. Polarad Electronics Corp., supra,* 287 F.2d at 495; *Avon Shoe Co. v. David Crystal, Inc., supra,* 279 F.2d at 612; Restatement of Torts § 729(d) and Comment g, § 731(g) and Comment e. "The general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone." Callman § 81.2, at 577 (footnote omitted). As we observed recently in *Taylor Wine Co. v. Bully Hill Vineyards, Inc.,* 569 F.2d 731, 733 (2d Cir. 1978), "every product has its own separate threshold for confusion of origin." The greater the value of an article the more careful the typical consumer can be expected to be; the average purchaser of an automobile will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine. The degree of reliance by consumers on labels and trademarks will also vary from product to product. *Modular Cinemas of America, Inc. v. Mini Cinemas Corp.,* 348 F.Supp. 578, 583 (S.D.N.Y.1972). It is easy to see that such differences in purchasing patterns affect the likelihood that confusion will result from the use of similar marks on non-competing goods from different sources.

■ In some cases, of course, as where the products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion. For example, in *Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971), we held that even though the ordinary purchaser would be expected to make "more than a casual inspection" before buying an expensive cam-

era, such inspection would be of doubtful value because the cameras from each of two different sources were both labelled "Exakta." In the instant case, however, where both the products involved and the marks involved are distinguishable, the care exercised by typical consumers is likely to reduce confusion. *See Blue Bell, Inc. v. Jaymar-Ruby, Inc., supra*, 497 F.2d at 435–36 & n.5 (expensive price range and fairly detailed purchasing process reduce likelihood consumers will be misled; purchases not "casual").

■ In *Omega* we noted that where a buyer market was composed of both discriminating and relatively unknowledgeable buyers, a court must consider the probability of confusion on the part of the latter as well as the former. *Omega Importing Corp. v. Petri-Kine Camera Co., supra*, 451 F.2d at 1195; *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., supra*, 281 F.2d at 761; Callman § 81.2, at 579. However, it is also true that the crucial issue is confusion on the part of an "appreciable number" of consumers. *Mushroom Makers, Inc. v. R. G. Barry Corp., supra*, 580 F.2d at 47. *See also Scarves by Vera, Inc. v. Todo Imports Ltd.,*

*supra*, 544 F.2d at 1175 (trademark owner must show that a junior user's conduct is likely to mislead "many customers"). At a certain point, confusion "will be too slight to bring the case above the rule of *de minimis*." *Triumph Hosiery Mills v. Triumph Internat'l Corp., supra*, 308 F.2d at 199; Restatement of Torts § 728, Comment a at 591. "The remote possibility of occasional confusion in those who observe less than ordinary care under the circumstances does not concern us." *Modular Cinemas of America, Inc. v. Mini Cinemas Corp., supra*, 348 F.Supp. at 582. " 'The purchasing public must be credited with at least a modicum of intelligence . . . .' " *Carnation Co. v. California Growers Wineries*, 97 F.2d 80, 81 (Cust. & Pat.App.1938).

■ McGregor offered no evidence establishing that any significant number of DRIZZLE purchasers are casual or unsophisticated. The district court was entitled to rely on the evidence indicating that the relevant purchasing group in fact tends to be sophisticated and knowledgeable about women's apparel. We cannot classify his findings in this regard as clearly erroneous.[7]

7. Nor was it error for the district court to admit and consider the testimony of expert witnesses called by Drizzle to establish the level of sophistication of the typical purchaser of Drizzle's coats. Each of these witnesses had extensive experience as a professional buyer of women's coats for major department stores. Under Fed.R.Evid. 702 it was entirely appropriate for the district judge to admit their testimony. "The broad discretion of the trial court to determine the qualifications of witnesses will not be disturbed unless its ruling was 'manifestly erroneous.' " *Fernandez v. Chios Shipping Co.*, 542 F.2d 145, 153 (2d Cir. 1976), citing *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962). *See also* 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶¶ 702[01]–[02] (1977). Any bias due to the witnesses' prior business relationships with Drizzle and any conflict between their testimony and that of McGregor's witnesses would go to the weight, not the admissibility, of this evidence. It was certainly not error for the district court to credit and rely on the largely uncontradicted testimony of witnesses whose professional performance must depend in large part on the accuracy of their assessments of the characteristics and buying habits of the typical purchaser of women's coats.

The court also permitted these witnesses to give their opinions as to whether the typical purchasers they had described would be likely to be confused by the similarity of the two marks at issue. The district judge specifically admitted this testimony "for what it was worth," and there is no indication in his opinion that he placed any reliance on this evidence. It has been said that as to questions such as the confusing similarity of two trademarks opinion testimony is unnecessary. *Venetianaire Corp. of America v. A & P Import Co.*, 302 F.Supp. 156, 158 (S.D.N.Y.1969), aff'd, 429 F.2d 1079 (2d Cir. 1970); Callman § 82.3(b), at 849. *See also Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 178–79, 16 S.Ct. 1002, 41 L.Ed. 118 (1896). But it is for the district court to decide what evidence will aid its decision of the case before it, and determinations as to relevance, probative weight, and credibility will not be disturbed unless this discretion has been abused. *See Triangle Publications v. Rohrlich*, 167 F.2d 969, 972 (2d Cir. 1948) (testimony of expert witnesses in merchandising field admitted on issues of secondary meaning, likelihood of confusion and injury to prior owner's reputation); *cf. Scarves by Vera, Inc. v. Todo Imports Ltd., supra*, 544 F.2d 1167 (testimony of expert witnesses in fashion industry admitted to establish plaintiff's status as "name" designer).

CONCLUSION

██ In trademark infringement cases involving non-competing goods, it is rare that we are "overwhelmed by the sudden blinding light of the justness of one party's cause." *King Research, Inc. v. Shulton, Inc., supra,* 454 F.2d at 69. Most often our affirmances in such cases rest on the more modest conclusion that the trial judge was not wrong in reaching the result appealed from. *See, e. g., Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 47; *King Research, Inc. v. Shulton, Inc., supra,* 454 F.2d at 69. It is on this basis that we affirm the district judge's decision. Judge Lasker applied the correct legal standard (likelihood of confusion) and the correct criteria (those enumerated in *Polaroid*) in reaching his result. Moreover, he quite properly regarded no single factor as determinative. *Triumph Hosiery Mills v. Triumph Internat'l Corp., supra,* 308 F.2d at 198, 200. Although the two marks at issue are concededly quite similar, the court below found that the DRIZZLER mark is only moderately strong, that the competitive distance between the products is significant, that there was no intention to bridge the gap, that no actual confusion has occurred, and that Drizzle adopted its mark in good faith. Thus the court's conclusion that likelihood of confusion had not been proved by McGregor is amply supported by its findings, none of which is clearly erroneous. *See Miss Universe, Inc. v. Patricelli, supra,* 408 F.2d at 509 (clearly erroneous standard applies to findings on factors other than similarity of marks); *Grotrian, Helfferich, Schulz, Etc. v. Steinway & Sons, supra,* 523 F.2d at 1339 n.16. And we do not believe that the error in analysis discussed in our opinion today compels reversal of the result reached by the district court.[8]

8. In light of our determination that no likelihood of confusion has been demonstrated, we find it unnecessary, as did the district court, to assess the significance of any past or present third party registrations of trademarks containing the term DRIZZLE.

9. In *Chandon Champagne* we also noted that although the defense of laches generally in-

██ Because McGregor has failed to establish a likelihood of confusion, the balance of interests of necessity tips in Drizzle's favor. Because the goods are concededly not competitive, McGregor's sales of DRIZZLER jackets cannot be expected to suffer. Where non-competitive goods are involved the trademark laws protect the senior user's interest in an untarnished reputation and his interest in being able to enter a related field at some future time. *Scarves by Vera, Inc. v. Todo Imports Ltd., supra,* 544 F.2d at 1172. Because consumer confusion as to source is unlikely, McGregor's reputation cannot be expected to be harmed. Because of the improbability that McGregor will enter the women's coat field under the DRIZZLER name, its right to expand into other fields has not been unduly restricted. Thus we see no injury to McGregor resulting from denial of the relief requested. On the other hand, if forced to give up its mark Drizzle could be expected to be harmed by loss of the goodwill that has been associated with the DRIZZLE name since 1969.

As we noted in *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531, 536 (2d Cir. 1964):

Although this court was the leader in granting relief to a trade-mark owner when there had been and was no likelihood of actual diversion [*i. e.,* in cases involving non-competitive products], we have likewise emphasized that, in such cases, "against these legitimate interests of the senior user are to be weighed the legitimate interests of the innocent second user" and that we must balance "the *conflicting interests* both parties have in the unimpaired continuation of their trade mark use." *Avon Shoe Co. v. David Crystal, Inc.* [*supra,* 279 F.2d at 613].[9]

cludes proof of actual knowledge by the party alleging infringement, "a plaintiff may be barred when the defendant's conduct has been open and no adequate justification for ignorance is offered." We reasoned that where the goods involved are non-competitive, the rights of the trademark owner must be asserted early, because delay "may lead the defendant to build up innocently an important reliance on the pub-

Following this approach, this Court has frequently supplemented its consideration of the *Polaroid* factors by balancing the conflicting interests of the parties involved. *See, e. g., Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 49; *King Research, Inc. v. Shulton, Inc., supra,* 454 F.2d at 69; *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., supra,* 411 F.2d at 1099–1100. Particularly when viewed in light of a balancing of the interests involved, the decision below warrants affirmance.[10]

---

licity of his mark, so that its loss would cost dearly." 335 F.2d at 535, *citing Dwinell-Wright Co. v. White House Milk Co.,* 132 F.2d 822 (2d Cir. 1943). *See also* Restatement of Torts § 751, Comments c and d.

**10.** After deciding against McGregor on the federal trademark infringement and false designation of origin claims, Judge Lasker dismissed, without reaching the merits of, the pendent state claim of unfair competition, stating that he was "compelled" to do so. This disposition has not been challenged on appeal. *But see* 28 U.S.C. § 1338(b); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *A. H. Emery Co. v. Marcan Products Corp.,* 389 F.2d 11, 19–20 (2d Cir.), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968) (state unfair competition claim joined with federal patent claim); *Hazel Bishop, Inc. v. Perfemme, Inc.,* 314 F.2d 399, 402–03 (2d Cir. 1963) (removal jurisdiction); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 543–44 (2d Cir. 1956); *Chester Barrie, Ltd. v. The Chester Laurie, Ltd., supra,* 189 F.Supp. at 99 n.1. *Cf. Flexitized, Inc. v. National Flexitized Corp.,* 335 F.2d 774 (2d Cir. 1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965) (trademark infringement claim dismissed; state unfair competition claim decided under both diversity and pendent jurisdiction). *See also Armstrong Co. v. Nu-Enamel Corp.,* 305 U.S. 315, 324–25, 59 S.Ct. 191, 83 L.Ed. 195 (1938) (Act of 1920), *cited in Clairol Incorporated v. Gillette Co.,* 389 F.2d 264, 267–68 (2d Cir. 1968).