SCHOENFELD INDUSTRIES,
INC., Plaintiff,

v.

BRITANNIA SALES, LTD., Defendant.

No. 81 Civ. 1834 (WCC).

United States District Court,
S. D. New York.

April 21, 1981.

Townley & Updike, New York City, for plaintiff; John Paul Reiner and Robert Lloyd Raskopf, New York City, of counsel.

Nims, Howes, Collison & Isner, New York City, for defendant; Warren R. Peterson, New York City, of counsel.

LASKER, District Judge.

Schoenfeld Industries, Inc. moves for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure to restrain Britannia Sales, Ltd. from using the tradename or trademark "BRITANNIA".

For the sake of clarity, Schoenfeld's trademark will be referenced in lower case, and Britannia's trademark in upper case letters.

## I.

Schoenfeld is engaged in the sale of apparel including jeans, pants, shirts, ties, jackets, sweaters, shorts, caps, belts and wallets. Since 1962, it has used the trademark "Brittania," [sic] initially on ties, and since the early 1970's on other apparel. In 1976, it registered its trademark with the United States Patent Office for pants, shirts, jackets and neckwear. In 1977, it obtained New York registration for its trademark for the same items and for shoes. Schoenfeld has sales offices throughout the United States and abroad. Since 1973, Schoenfeld's total sales of "Brittania" products reached $700 million.

Britannia Sales, Ltd. sells expensive blankets, throws, sheets and pillowcases manufactured in Great Britain. Britannia's sales are approximately $2 million per year. It has been using the "BRITANNIA" name since 1978. It is plain that at present the products of the parties do not compete.

Schoenfeld alleges that Britannia's use of the name "BRITANNIA" infringes Schoenfeld's registered trademark in violation of 15 U.S.C. § 1114(1) and N.Y.Gen.Bus.Law § 368–b, and its common law trademark, and constitutes false designation of origin in violation of 15 U.S.C. § 1125(a), unfair

competition, dilution of its trademark in violation of N.Y.Gen.Bus.Law § 368–b, and injury to its good will, reputation and business relationships.

## II.

A preliminary injunction may be granted only upon a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979). *Accord Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206–07 (2d Cir. 1979); *Sonesta International Hotels Corporation v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973). Because we find, as discussed below, that even though Schoenfeld has raised serious questions going to the merits, it has not shown that it will suffer irreparable harm nor that the balance of hardship tips decidedly in its favor, the motion is denied.

### A. The Merits

■ A trademark owner is entitled to protection against the use of its mark, or a similar mark, on products other than those to which the owner has applied it if "there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Incorporated v. R.G. Barry Corporation,* 580 F.2d 44, 47 (2d Cir. 1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). *Accord Vitarroz Corporation v. Borden, Inc.,* 644 F.2d 960, 965 (2d Cir. 1981); *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130 (2d Cir. 1979). To facilitate that determination, the Second Circuit has stated the relevant factors for consideration:

> "Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account."

*Polaroid Corporation v. Polarad Electronics Corporation,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *Accord Vitarroz Corporation v. Borden, Inc.,* 644 F.2d 960, 966 (2d Cir. 1981); *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1130 (2d Cir. 1979); *Mushroom Makers, Incorporated v. R.G. Barry Corporation,* 580 F.2d 44, 47 (2d Cir. 1978) (per curiam), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1173 (2d Cir. 1976).

### 1. The Strength of the Mark

The first *Polaroid* factor, the strength of the mark, "refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor-Doniger, supra,* at 1131. In *McGregor,* the Court of Appeals designated levels of "strength" as follows:

> "the four categories into which terms are classified for trademark purposes . . . Arranged in ascending order of strength, these categories are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. A generic term can never become a valid trademark and cannot be registered. A descriptive term can be registered . . . only if it has acquired 'secondary meaning.' Suggestive marks, falling between the merely descriptive and the arbitrary or fanciful, are entitled to registration without proof of secondary meaning, as are fully arbitrary or fanciful terms."

*Id.* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976)).

Schoenfeld argues that its mark is strong because it is arbitrary and fanciful, not geographically descriptive. Britannia contends that Schoenfeld's mark is weak because it is a variation of the geographic term "Britannia" and that Schoenfeld has not proven that its mark has acquired secondary meaning.

Schoenfeld relies on *Schoenfeld Industries, Inc. v. Foster Industries, Inc.*, 79 Civ. 4917 (S.D.N.Y. September 28, 1978), in which it obtained a preliminary injunction against the use of the mark "BRITANNIA" on the fashion jeans sold by the defendant there. In *Foster*, Judge Palmieri rejected the defendant's contention that Schoenfeld's mark was a geographically descriptive term derived from the province in France, Brittany, and found that even if it was descriptive, Schoenfeld had proven its "secondary meaning."

Britannia was not a party to the *Foster* action and of course is not bound by its ruling, but the decision is entitled to respectful consideration. However, Britannia argues that Schoenfeld's trademark is descriptive of Great Britain, and not of Brittany, France, and *Foster* addressed the latter contention only. Moreover, on the record before us, it appears that Schoenfeld, despite its claim that its mark is arbitrary or fanciful, benefits from the geographic connotation of its mark. For example, although its products are manufactured in the Far East, its logo contains a design which clearly suggests the lower half of the Union Jack, the flag of Great Britain, a country noted for the production of high quality textiles. Further, its advertising campaign which includes slogans such as "My home is in Rome, but I live in Brittania," also capitalizes on the geographic connotation of its mark.

■ Turning, therefore, to the question of secondary meaning, it is not clear what evidence on this issue was presented in *Foster*. Although Schoenfeld may or may not prove at trial here that its mark has achieved secondary meaning, it clearly has not established that fact on the record to

date in this case. It is true that Schoenfeld has shown the extensive growth of its sales and advertising of "Brittania" products. For example, sales of "Brittania" sportswear during the first three months after its introduction in September 1973 were $300,-000. In 1974, sales increased to $4.8 million, and in 1975 to $45 million. Schoenfeld projects its worldwide sales for 1981 will be $220 million. Advertising expenses were $2 million in 1979 and $4 million in 1980. However, this evidence is insufficient alone to support a finding that consumers understand "Brittania" to signify Schoenfeld's products, and the record contains no consumer surveys or other evidence of consumer reaction. *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 446 F.Supp. 160, 163 (S.D.N.Y. 1978), aff'd, 599 F.2d 1126 (2d Cir. 1979).

### 2. Similarity of the Marks

■ Britannia concedes that its mark and Schoenfeld's mark are "for practical purposes ... identical." However, such a conclusion does not of course, dispose of the matter. *Vitarroz Corporation v. Borden, Inc.*, 644 F.2d 960 (2d Cir. 1981).

### 3. Proximity of the Products and Bridging the Gap

Schoenfeld has sold various items of apparel under the "Brittania" name. It claims that it is also considering expansion of its line or franchise into sport shoes, jogging clothes, swimsuits and travel bags (Affidavit of Brian Kremen, Vice-President and General Counsel of Schoenfeld, ¶ 6, sworn to March 26, 1981).

Britannia sells expensive, high quality bedding items manufactured in Great Britain.[1] The sheets are made of cotton flannel fabric and the blankets are woolen. These imports are relatively expensive; for example sheets start at $25.00 (retail) and the blankets generally cost $120.00, but range as high as $375.00 and, if cashmere, $1,500.00. On the other hand, Schoenfeld does not claim that its products are at the more expensive end of the range of sportswear prices.

---

1. Britannia also sold $2,000. worth of scarves once to Neiman-Marcus (Tr. 88).

There is no doubt that the products presently sold by the parties are such as to make it unlikely that consumers will be confused as to their origin. However, Schoenfeld argues that its future "logical expansion"[2] is into the market of linens and blankets and points to the cases of other producers of designer jeans and sportswear which have already given franchises in those fields. Paul A. Weiss, President of Brittania Neckwear Division, testified that to remain competitive with companies such as Jordache, for example, it is "very important" for Schoenfeld to license its marks for other products.

"The greater amounts of exposure you have in all product lines the greater support you have in your original base product that you have established yourself in. The creditability of the customer where necessary is through the diversification of having your name, as I said, in as many product areas as you possibly can, be it apparel or be it domestics or hard goods."

(Tr. 47–48). It is noteworthy, however, that Schoenfeld presented no evidence whatsoever that it presently intended to expand into linens and blankets although it did show that it intended to begin selling the other products referred to above. Consequently, although at best Schoenfeld demonstrated a possibility that it might "bridge the gap" sometime in the future, it has not demonstrated that that possibility is sufficiently real or imminent to justify granting the drastic relief of a preliminary injunction. Equitable powers should not be exercised to impose an onerous penalty on a junior user on the basis of a sheer possibility that the senior user may some day invade the field occupied by the junior.

### 4. Actual Confusion

Schoenfeld argues that it has proven actual confusion on the part of consumers as to the source of the parties' products. However, as detailed below, we find that Schoenfeld has not clearly shown that actual confusion has occurred.

The strongest evidence of actual confusion is a letter from Keith A. Forbes, who at the time the letter was written was the Managing Director of Britannia Sales, to Kinne Hawes, Schoenfeld's Assistant General Counsel. In it Forbes stated,

"It would appear your marketing needs to be amended to show clearly to your customers that we—BRITANNIA SALES LTD—is NOT the returns center for your jeans and other products. We are constantly receiving letters and debit memos advising of returns to us of your products—and are receiving numerous calls on our WATS line on the same subject as well as calls asking us for details of your lines. So far, these activities, in costs of WATS line usage, mailing returns, etc. have cost us well in excess of $500.00 and it would be appreciated if this could be refunded us."

The letter has limited probative value however, for several reasons. First, it appears that Forbes left Schoenfeld soon after the letter was written, and the question arises whether he was hostile to Britannia at the time he wrote the letter. Second, Forbes was not produced as a witness, and his statements have not been subject to cross-examination. Finally, the affidavit of Susan Dobson, the Treasurer and U.S. Business Manager for Britannia, sworn March 31, 1981, raises questions about the accuracy of the statements in the letter.

The other evidence offered by Schoenfeld on this issue adds little weight to its position. For example, the secretary to Schoenfeld's president testified that she recently received the following phone call:

"a woman on the other end asked, Is this the Brittania [sic] Company that made these sheets and blankets, and I was very confused and I was not [sic] aware that Brittania was not in that end of the business and that she most probably had the wrong number, and at which point she thanked me and we hung up the phone."

(Tr. 38). However, this was the only "such call" she received in the four and one-half years she has worked at Schoenfeld. Other

2. Tr. 138.

items offered by Schoenfeld include an advertisement for one of Britannia's blankets in a mail order catalogue which misspelled the name as "Brittania," and the fact that Britannia received a check from a department store which had been a long standing customer of Schoenfeld. Putting aside the puzzling nature of the last event, it does not follow from these isolated instances that the public is likely to be confused as to the origin of the respective parties' products.

### 5. Britannia's Good Faith

No evidence was submitted by either side tending to prove either Britannia's good faith or bad faith in adopting its tradename. However, in light of the absence of evidence, the argument is persuasive that Britannia chose its name to reflect the origin of its products[3] rather than to reap the advantage of Schoenfeld's name in sportswear.

### 6. Sophistication of Buyers

No evidence was introduced as to the sophistication of the purchasers of Schoenfeld's products. On the other hand, the only evidence on the point indicates that the purchasers of Britannia's products are relatively knowledgeable about the items they purchased. In addition to her position at Britannia, Dobson has owned shops which sell Britannia's products. She testified that the people who purchased them at her stores tended to have had knowledge of the relative quality of cotton flannel sheets and woolen blankets in England, and knew about the products and their relatively high price (Tr. 76–77).

\*     \*     \*     \*     \*     \*

In sum, we find that Schoenfeld has not, on the record to date, established that it is likely to succeed on the merits of its claims, although it has raised serious questions going to the merits making them a fair ground for litigation.

---

**3.** This would be particularly advantageous to Britannia, since the products it sells, cotton

### B. The Relative Harm to the Parties

Schoenfeld has not demonstrated either that it will be irreparably harmed if its motion for a preliminary injunction is denied or that the balance of hardship tips in its favor.

Schoenfeld has coexisted with Britannia for three years, and although it has not submitted its sales statistics for those years, it nevertheless projects its sales this year will reach $220 million. Schoenfeld does not claim to intend presently to compete directly with Britannia in the area of linens and blankets, and it does not appear likely to do so before trial of this action. Accordingly, it is plain that Schoenfeld will not be harmed if Britannia continues to sell its high quality, specialized, non-competing products pending trial.

On the other hand, if enjoined from continuing to use its name Britannia will be severely harmed by the resulting injury to its business and reputation.

The motion for a preliminary injunction is denied.

This opinion constitutes our findings of facts and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

It is so ordered.

---

flannel sheets, are not manufactured in the United States (Tr. 72).