**MR. HERO SANDWICH SYSTEMS, INC., Appellant,**

v.

**ROMAN MEAL COMPANY, Appellee.**

**Appeal No. 85–2031.**

United States Court of Appeals, Federal Circuit.

Jan. 10, 1986.

Linn J. Raney of Watts, Hoffmann, Fisher & Heinke, Co., L.P.A., Cleveland, Ohio, argued for appellant.

Edward M. Prince of Cushman, Darby & Cushman, Washington, D.C., argued for appellee.

Before BALDWIN, KASHIWA, and BENNETT, Circuit Judges.

BALDWIN, Circuit Judge.

This appeal is from the decision of the U.S. Patent and Trademark Office Trademark Trial and Appeal Board (board), which granted a petition by Roman Meal Company (Roman Meal) to cancel registration of the mark ROMANBURGER for specially prepared carryout foods, namely, sandwiches sold for consumption on or off the premises. Mr. Hero Sandwich Systems, Inc. (Mr. Hero), whose name has since been changed to Restaurant Developer's Corp., registered that mark on May 20, 1980. Roman Meal filed its petition to cancel the registration on August 18, 1980. The board, with one member dissenting, issued a decision granting the cancellation petition on October 31, 1984. Mr. Hero filed a request for reconsideration by the board, which was denied. Mr. Hero appeals. We reverse.

### Background

Mr. Hero has used the mark ROMANBURGER since 1967. The sandwich consists of two beef patties, lettuce, tomatoes, onions, melted cheese, Italian salami, luncheon meat, various dressings, and mayonnaise on an Italian hearth baked roll. These sandwiches are sold in sixty-four Mr. Hero restaurants, thirteen of which are company owned and the remainder of which are franchises. All the restaurants provide carry out service; about sixty percent have some dining facilities on the premises, ranging from ten to two hundred and twenty-five seats. None of the restaurants provides waiter service.

The ROMANBURGER mark is used on menus, on sandwich wrappers and on boxes containing the sandwiches. Mr. Hero advertises its mark on radio, television and in newspapers. In 1982, Mr. Hero spent approximately $375,000 on radio, television, and print advertising, with about twenty-five percent of that amount allocated to newspaper ads. About one third of the radio and television advertisements referred to or featured the ROMANBURGER sandwich. About forty percent of the print advertisements referred to or featured the ROMANBURGER sandwich.

Mr. Hero's gross sales volume for 1982 was in excess of fifteen million dollars with approximately two and a half to three million dollars deriving from sales of the ROMANBURGER sandwich.

The ROMAN MEAL trademark has been in use since 1910. Roman Meal was incorporated in its present form in approximately 1927. Roman Meal has used and registered several marks, including ROMAN and soldier design for cereal breakfast food, bread, biscuits, cookies, and crackers; ROMAN MEAL for breakfast cereals, a blend of whole wheat flour, whole rye, wheat bran and flax for use by bakers, and bread; ROMAN MEAL and soldier design for bread, biscuits, cookies, and crackers; ROMAN MEAL COOKS IN 5 MINUTES and soldier design for a cereal food consisting of a blend of wheat, rye, bran and flax, for use as a breakfast cereal or for use in baking or other forms of cooking; ROMAN MEAL and soldier design for biscuits, bread, buns, cereal, cookies, flour, muffin mix, pancake mix and rolls; ROMAN LIGHT for baker's mixture containing soya protein concentrate, rice, bran, defatted wheat germ and dough conditioner for use by bakers as a special ingredient for fresh baked bread, hamburger buns, brown and serve rolls and loaves, dinner rolls and english muffins; ROMAN MEAL for frozen waffles; and ROMAN MEAL and design for bread and frozen waffles; and ROMAN WHITE for bread. These bakery products are sold to grocery stores and supermar-

kets as well as to institutions such as prisons, hospitals, restaurants, and rest homes.

The Roman Meal marks are used in displays in supermarkets and grocery stores, and on the packaging for the various products. Roman Meal advertises on radio, television, in newspapers and in magazines, and spent approximately seventy-five million dollars in advertising and promotion of its ROMAN MEAL, ROMAN LIGHT, and ROMAN WHITE products for the period of 1972–1982. Retail sales of the bakery products for the same period have exceeded one billion dollars, making Roman Meal the leading seller of dark bread in the United States with close to twenty-five percent of the market.

Roman Meal has provided pictures of its products since 1978. They are designed to be clipped onto restaurant menus to suggest that the restaurant is serving sandwiches on ROMAN MEAL bread or serving hamburgers on ROMAN MEAL burger buns. In 1979 Roman Meal prepared table tents for use on tables in restaurants. These items pictured one or another of the bakery products and are used to suggest that hamburgers or sandwiches served in the restaurant are made with ROMAN MEAL buns or bread. Approximately 50,-000 table tents and the same number of menu clip-ons were printed.

Roman Meal filed a petition to cancel the registration on the grounds that it is a large manufacturer and distributor in interstate commerce of various bakery products including bread and burger buns; it is the owner of the trademark ROMAN MEAL which has been used to distinguish its bakery products from those of others since long prior to the date of first use of the ROMANBURGER mark; it is the owner of a number of marks, including ROMAN and soldier design, and ROMAN LIGHT, which have been in use since prior to the registration of ROMANBURGER and ROMAN WHITE which was adopted afterward. Roman Meal alleges Mr. Hero's mark so resembles its own mark as to be likely to cause confusion, mistake or deception re-

garding the source of goods, under § 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

Mr. Hero responded that the respective marks are mutually exclusive in that they differ substantially from each other visually and phonetically and in the kind of goods they suggest; they are applied to non-competitive, dissimilar goods which are not dispensed to a common class of purchasers and do not move in the same channels of commerce as Roman Meal's products. Further, Mr. Hero points out that the goods have co-existed in the same geographic area for a number of years without any evidence of actual confusion.

Although it conceded that the marks and goods are not identical, the board, with one member dissenting, granted the cancellation petition. The board's reasoning was that regardless of present channels of commerce, people familiar with Roman Meal's products would, upon seeing the same or similar mark used in connection with a sandwich, be likely to mistakenly believe that the sandwich was served on a Roman Meal bun. Further, the board expressed its view that the word "Roman" was the dominant element in both marks, and that Roman Meal's use of the word "Roman" in conjunction with a variety of other elements such as the soldier design and the words "Light" and "Meal," had resulted in a certain consumer recognition that the "Roman" portion of the mark is recognized as the source indicator. The board therefore reached the conclusion that "Mr. Hero's mark so resembles the marks ROMAN MEAL, ROMAN [sic: ROMAN and soldier design], and ROMAN LIGHT as to be likely, when applied to Mr. Hero's sandwiches, to cause confusion, mistake or deception." A request for reconsideration was denied, and Mr. Hero appeals.

### OPINION

The pertinent statutory provision governing registrability of trademarks, section 2 of the Lanham Act, 15 U.S.C. § 1052, provides:

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

\* \* \* \* \* \*

(d) Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive \* \* \*.

■ The basic principle in determining confusion between marks is that marks must be compared in their entireties and must be considered in connection with the particular goods or services for which they are used. *In re National Data Corporation*, 753 F.2d 1056, 1058, 224 USPQ 749, 750 (Fed.Cir.1985). In testing for likelihood of confusion under section 2(d) of the Lanham Act, the following, when of record, must be considered:

(1) The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

\* \* \* \* \* \*

(3) The similarity or dissimilarity of established, likely-to-continue trade channels.

*In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669, 223 USPQ 1281 (Fed.Cir.1984).

■ The board found that the respective marks are not identical. Its rationale for concluding that they are so similar as to be likely to cause confusion, mistake, or deception is that they share a single common element: the word "Roman." Roman Meal has not registered the mark ROMAN. It

has registered "ROMAN *with soldier design*." The visual impression of ROMAN-BURGER vis-a-vis the registered "ROMAN with soldier design"

Romanburger

tends to negate a finding of likelihood of confusion, mistake, or deception because they are not similar in appearance, and the board did not rely on this registration as the basis for its decision. Rather the board looked to the group of registered marks, none of which look like ROMANBURGER.

■ Despite the dissimilarity of the marks and the lack of registration of the mark ROMAN (without design), the board found rights in the word "Roman" as the dominant element in the marks. This finding is based on the type of use Roman Meal has made of its marks. Roman Meal owns several marks with "Roman" as a common element, and the board could reasonably conclude that the "Roman" portion of these marks has come to be recognized as a source indicator. We do not agree, however, that the use of the word "Roman" in the ROMANBURGER mark has the same effect.

The word "Roman" in the mark RO-MANBURGER is part of a unitary phrase that does not create the separable impression found in the Roman Meal marks. It does not stand alone as a source indicator. "Romanburger" is one word, not "Roman" plus another word. The mark is pronounced as one word, with sound and cadence distinctly different from the Roman Meal marks, and in its entirety is suggestive of a variety of sandwich appropriately used in a carry-out food store. We see no reason to believe, and there is no evidence on the point, that consumers are likely to extract "Roman" from "Romanburger" and rely on "Roman" per se as an indication of source.

We would add that the board has given insufficient emphasis to the channels of trade for these goods. Roman Meal goods are sold to institutions and grocery stores. They are part of a meal which will be prepared at a later time. Romanburgers are identified in their trademark application as specially prepared sandwiches sold for consumption on or off premises. Romanburgers are limited by those terms to narrow and specifically identified channels of trade. In its effort to demonstrate the similarity of the channels of trade, Roman Meal points to its printing of approximately 50,000 each of table tents and menu clip-ons for use in restaurants. The menu clip-ons were developed in 1978, and the table tents were prepared in 1979. Apparently some of these displays show the legend ROMAN MEAL Burger Buns. This evidence of use of the Roman Meal marks in connection with restaurant food is not persuasive of likelihood of confusion. Assuming the bread products were sold as sandwiches, there is no evidence that these sandwiches were sold as Roman Meal sandwiches. Rather, the clear implication is that these foods may be sold under a particular restaurant's mark with the concurrent advertising that Roman Meal bread or

buns were used. We agree with the dissenting board member that had there been other evidence, a trademark licensing agreement between Roman Meal and the restaurant owners, for example, the company's position would be stronger. The circumstances as a whole are insufficient to show that Roman Meal products are normally distributed under its marks to restaurant patrons.

As we consider factors relevant to our decision, we note these marks have coexisted since 1967 without evidence of actual confusion. This lack of evidence is certainly not dispositive where the issue is likelihood of confusion, mistake or deception, but it does suggest that the marks are not so easily confused.

Our review of the record indicates that the marks are not similar in their entireties as to appearance or sound; their connotations are different, and therefore the overall commercial impression of the marks is different.

Evidence of record indicates the trade channels of the goods are different. Roman Meal goods are distributed through grocery stores and institutions for later consumption; ROMANBURGERS are distributed through fast food restaurants for immediate consumption. These distinctions coupled with the lack of actual confusion over a period of years lead us to conclude that use of the mark ROMANBURGER is not likely to cause confusion, mistake or deception. Accordingly, we *reverse*. Our disposition of these issues renders discussion of other issues raised by the parties unnecessary.

REVERSED.