**PIERCE FOODS CORPORATION, Plaintiff,**

v.

**CONAGRA, INC., and Peavey Company, d/b/a Banquet Foods Company Giant Foods, Inc., Defendants.**

**Civ. A. No. 85–1357–A.**

United States District Court, E.D. Virginia, Alexandria Division.

July 1, 1986.

Laurence Brown, James I. Hardy, James F. Browne, Arlington, Va., for plaintiff.

W.M. Webner, Esquire, Local Counsel, Arlington, Va., Richard H. Compere, Willian Brinks Olds Hofer Gilson & Lione, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

CACHERIS, District Judge.

This is an action brought by Pierce Foods Corporation ("Pierce") for damages and injunctive relief against the defendants ConAgra, Inc., and Peavey Company, d/b/a Banquet Foods Company, and Giant Foods, Inc. Plaintiff seeks to protect its trademark registration of "WING DINGS" from use by the defendants. After reviewing the pleadings, authorities, arguments of counsel, and for reasons set forth below, judgment is entered in favor of the defendants.

### I

#### Findings of Fact

Plaintiff, Pierce Foods Corporation, is a corporation organized under the laws of the State of Delaware with its principal place of business in Moorfield, West Virginia. Pierce is a subsidiary of Hester Industries, Inc. ("Hester").

Defendant, ConAgra, Inc., is a Delaware corporation with its principal place of business in Omaha, Nebraska. Defendant Peavey Company is a wholly owned subsidiary of ConAgra. Peavey is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Defendant Banquet Foods Company is a division of Peavey and has its principal place of business in Ballwin, Missouri.

Defendant, Giant Foods, Inc., is a Delaware corporation with its principal place of business in Washington, D.C.

For over thirty years Pierce and affiliated companies have been in the business of selling prepared frozen chicken products to restaurants and other institutional buyers such as hospitals and large company cafeterias. Pierce has been selling chicken wing products under the designation "WING–DINGS" since 1964.[1] Presently, the sale of chicken wings under the designation "WING–DINGS" constitutes approximately 20% of Pierce's sales. The chicken wing products are pre-cooked and frozen and consist of two disconnected chicken wing joints, namely, the drumette and the web. On June 21, 1966, Pierce's application for Registration No. 810,210 for the designation "WING–DINGS" in association with its frozen pre-cooked chicken wings was granted by the United States Patent Office.[2] Through the subsequent filing of appropriate declarations, Pierce's "WING–DINGS" registration has been granted incontestibility status. Since being granted this status, Pierce has successfully challenged between 40 to 50 users of the mark "WING DINGS."

Pierce markets "WINGS DINGS" chicken wings through Marketeam, Inc., an exclusive food broker which is also a wholly-owned subsidiary of Hester. The products are primarily sold to food distributors in 43 states. In addition to Marketeam, Inc., the products are also sold by other food service brokers to food service distributors. Pierce and Hester have little or no presence in the retail market for food products. Plaintiff presented no evidence of any regular sales of products bearing the designation "WING–DINGS" through retail out-

---

1. Actually, the "i" in "Dings" is upside down under Pierce's designation.

2. The "i" in "Dings" is similarly upside down on the Registration Statement.

lets.[3] In the 1986 National Frozen Food Association Directory, a trade publication of the frozen food industry, Pierce stated that 100% of their business was institutional. (Defendants' Exhibit 17).

Pierce packages its "WING DINGS" products in institutional packages with several posters, table tents, and menu tabs bearing the designation "WING DINGS" inserted therein. These promotional items are inserted with the products so that they can be displayed by the restaurant or institutional feeders that receive them. Pierce has no knowledge of how the "WING DINGS" products are prepared or the extent to which restaurants use the posters, menu tabs, or table tents advertising the product. Pierce has not used any procedures for checking the preparation or promotion of its product by its restaurant or institutional clients.[4]

Pierce otherwise advertises its "WING DINGS" products in trade publications available to the food service industry. However, Pierce has never advertised the term "WING DINGS" in any retail publication intended to reach the general public.

Pierce's best market for its chicken wing products sold under the designation "WING DINGS" is in the Pittsburgh, Pennsylvania, metropolitan area. In Pittsburgh, a survey was conducted by defendant's expert witness, Dr. Hans Zeisel, to determine adults' understanding of the designation "wing dings." The survey was conducted with approximately 400 adults. Fifty percent of those asked "have you ever heard of a food in a restaurant called wing dings" said "no." Another 9% stated they had heard of a food product called wing dings, but did not properly describe the product when asked to do so. The remaining 41% were then asked a question to solicit whether they understood "wing dings" to be a trademark like Haagen-Dazs for ice cream, or a common name like onion rings for a food product. Fifty-eight percent stated that it was a common name or a generic term, like onion rings; 16% said it was a trademark like Haagen-Dazs; and 26% did not know.

Banquet has been trading in the frozen food business for approximately forty years. The 1986 National Frozen Food Association Directory lists Banquet's sales as 95% retail and 5% food service. The "BANQUET" trademark is well known throughout the United States in association with frozen food products sold through retail outlets.

In May of 1985, Banquet developed an advertisement which bore the headline "Cook up a wing-ding!" (Plaintiff's Exhibit 1). The ad cost $14,559.18 to develop and was placed in 60 newspapers across the country for the sum of $193,337.00. The ad was run on September 29, 1985, and contained a coupon redeemable on any of the 35 different frozen chicken dinner packages sold by Banquet. From September 29, 1985, through March, 1986, 68 coupons that had been attached to the advertisement were redeemed. One of these coupons was redeemed at defendant Giant Foods, Inc.'s store in Shirley Park, Arlington, Virginia.

No one involved in the preparation of the Banquet advertisement was aware of any use or registration of the designation "WING DINGS" by Pierce or Hester. The word "wing-ding" was suggested by Banquet's advertising agency and was used in its dictionary sense, meaning a wild or lav-

---

**3.** Pierce offered scant evidence of any retail sales of WING DINGS. Wendell Hester, President of Pierce, could only testify that he had seen the product sold in three pound packages in one supermarket in Winchester, Virginia.

**4.** As an exception, Pierce does have a special relationship with one client, Brann's Steak & Seafood, Inc., whom Pierce licensed to use its brand name of "WING DINGS" in connection with chicken hors d'oeuvres. Under the terms of that agreement, Pierce has a right to inspect Brann's restaurant facilities to observe that it is maintaining the level of quality consistent with Pierce's conditions. In addition, Brann's is required to advertise that it features Pierce's food brand "WING DINGS" chicken hor d'oeuvres. (Defendants' Exhibit 18). Pierce has no such arrangement with any of its other clients.

ish party.[5] The packaging for Banquet's two frozen chicken wing dinners, as well as for all other Banquet frozen chicken dinners, do not contain the word "wing ding." All, however, prominently bear the "BANQUET" trademark. Banquet's ad of September 29, 1985, also prominently bears the "BANQUET" trademark.

Although defendant Giant Foods, Inc. has sold BANQUET dinners and has redeemed a coupon attached to the advertisement in question in regard to the sale of a fried chicken dinner, it was not connected in any way with the adoption and use of the designation wing-ding in the September 29, 1985, advertisement placed by Banquet in newspapers across the country. Giant Foods, Inc. has not used the words "wing ding" in association with any food products and has not acted in concert with defendant Banquet in regard to any activity involving the use of the words "wing ding" in association with the ad in question.

## II

### Conclusions of Law

This is an action for trademark infringement under the Lanham Trademark Act of 1946 (15 U.S.C. §§ 1051–1127) and for false designation of origin, false description and unfair competition in violation of Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)) and other common law and statutes of the Commonwealth of Virginia. Jurisdiction is vested in this court by reason of 15 U.S.C. § 1121 and 28 U.S.C. § 1338. The amount in controversy exceeds $10,000.00, exclusive of interest and costs.

■ In order for Pierce to recover for infringement of a federally registered trademark it must establish that there is a likelihood of confusion in regard to defendants' use of the designation "wing ding" in the September 29, 1985, advertisement.

Armand's Subway, Inc. v. Doctor's Associates, Inc., 604 F.2d 849, 851, n. 4 (4th Cir.1979); Durox Company v. Duron Paint Manufacturing Company, 320 F.2d 882 (4th Cir.1963); 15 U.S.C. § 1114.[6] In order for Pierce to recover for infringement of its Virginia common law trademark rights it must similarly establish that there is a likelihood of confusion. Rosso & Mastracco, Inc. v. Giant Food Shopping Center of Virginia, Inc., 200 Va. 159, 104 S.E.2d 776 (1958).

■ In determining whether there is a likelihood of confusion, the courts have considered the following factors to be helpful:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark;
8. likelihood of expansion of the product lines.

Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc., 670 F.2d 642, 648 (6th Cir.1982); Durox Company v. Duron Paint Manufacturing Company, 320 F.2d 882 (4th Cir.1963). Applying these factors to the present case, the court finds that there is no likelihood of confusion which arises from defendant Banquet's use of the advertisement in question.

■ The strength of a trademark depends on either its distinctiveness or its tendency to identify goods sold as produced by a particular source. McGregor-Doniger v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir.1979). The "WING DINGS" mark is weak on both counts. "WING DINGS" is not distinctive.[7] The term has a common

---

**5.** "Wing ding" is defined in Websters New Collegiate Dictionary as "1: a wild, lively, or lavish party, 2: a pretended fit or illness." (Defendants' Exhibit 25).

**6.** The statutory test is whether "such use is likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods or services." 15 U.S.C. § 1114.

**7.** Of course, the court is referring to the words "WING DINGS" spelled as herein set forth and as included in Defendant's advertisement and

dictionary definition as a "wild, lively, or lavish party." Banquet's advertising has emphasized the common usages of the words, underscoring their lack of distinctiveness. Similarly, the "WING DINGS" mark does not have a strong tendency to identify goods sold as those produced by Pierce. The survey performed by Dr. Hans Zeisel, whom the court found to be a most informative witness on his subject of expertise,[8] showed that only 16% of adults surveyed in Pierce's best market area understood the term "WING DINGS" to be a trademark and not a generic term. Pierce does not advertise in any publications that are distributed to the general public, nor does the mark appear on any goods that are distributed through retail outlets. While Pierce claims that its mark is known by restaurant patrons because of the use by restaurants of its table tents, posters, and menu inserts, which Pierce packages along with its chicken wing products, there is little evidence regarding such recognition. Pierce has no knowledge of the extent to which restaurants use the posters, menu tabs, or table tents to advertise their product. In short, the evidence shows that Pierce's "WING DINGS" trademark appears to have little if any recognition among purchasers of frozen food products in retail stores. As such, it would not be considered a strong mark in relationship to this class of customers.

The goods involved in this case are similar. Both the Pierce product and the Banquet ad involve prepared pre-frozen chicken wings.

The Pierce "WING DINGS" mark is similar to the word "wing ding" in the Banquet ad. This similarity would not tend to confuse the average person because first, the Pierce mark contains a distinctive upside down "i" which is not present in the Banquet ad and second, the appearance of

the well known "BANQUET" mark in association with the advertisement tends to dispel any likelihood of confusion.

Pierce has not introduced any evidence of actual confusion in regard to the use by Banquet of the phrase "Cook up a wingding!" in the September 29, 1985, ad.

Pierce's goods are marketed through institutional food brokers and distributors for actual use by restaurants and other food service industry customers. The ad in question was directed to retail store customers for frozen food products. Pierce does not advertise in general circulation newspaper, nor any other media directed toward the general purchasing public. The fact that the parties do not market through the same channels of trade, nor advertise through the same media, is further evidence of no likelihood of confusion. *Durox Company v. Duron Paint Manufacturing*, 320 F.2d at 884; *Mr. Hero Sandwich Systems, Inc. v. Roman Meal Co.*, 781 F.2d 884, 888–89 (Fed.Cir.1986); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir.1980).

There is no evidence bearing on the issue of likely degree of purchaser care.

 Intent of the defendant is a factor because it may justify the inference of confusing similarity where a name is adopted to deprive another of the benefit of a mark. *See Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.1982). Banquet's intent in selecting the ad in question was not to promote its chicken wing products by taking advantage of the Pierce trademark. The evidence showed that no one involved in the preparation of the Banquet advertisement was aware of any use or registration of the "WING DINGS" mark by Pierce. Thus, there is no inference of

---

not as set forth in Pierce's Registration Statement with the "i" in "Dings" set upside down. If defendants had spelled the word "ding" with an upside down "i" then the court would be looking at a different situation.

8. The court heard evidence from Dr. Hans Zeisel concerning the conduct of the survey. Plain-

tiff then called Dr. Charles Mannas an opposing expert who criticised the survey. Assessing the credibility of the witnesses, the court finds that Dr. Zeisel properly conducted the survey and that his conclusions contained therein are scientifically valid.

likelihood of confusion arising from Banquet's intentions in promoting the September 29, 1985, ad.

As to the likelihood of expansion of product lines, Mr. Hester testified that Pierce intended to expand in the retail market but has offered no timetable or projections as to when that would be undertaken.

Based on the above analysis, the record appears clear that there is no likelihood of confusion of plaintiff's mark "WING DINGS" with the phrase "Cook up a wing ding!" which appears on defendant Banquet's September 29, 1985, advertisement. Pierce's actions under federal and state law for trademark infringement against all the defendants will therefore be dismissed.

An appropriate Order shall issue.