WELCH ALLYN, INC., Plaintiff,

v.

TYCO INTERNATIONAL SERVICES AG; Tyco International Ltd.; Tyco Healthcare Group LP; Tyco International, Inc.; Tyco International (USA); Tyco International (U.S.), Inc.; Ludlow Company LP; and The Kendall Company, Defendants.

No. 501CV1806FJSGJD.

United States District Court, N.D. New York.

May 14, 2002.

134

Bond, Schoeneck & King, LLP (Deborah H. Karalunas, Louis Orbach, of counsel), Syracuse, NY, for Plaintiff.

Milbank, Tweed, Hadley & McCloy, LLP (Jeffrey Barist, Parker H. Bagley, John M. Griem, Jr., of counsel), New York

City, Scolaro, Shulman, Cohen, Lawler & Burstein, P.C. (Ted H. Williams, of counsel), Syracuse, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief Judge.

### I. INTRODUCTION

On November 30, 2001, Plaintiff Welch Allyn, Inc. filed a five count complaint against Defendants Tyco International Services AG ("Tyco Services"), Tyco International, Ltd. ("Tyco International"), Tyco Healthcare Group LP ("Tyco Healthcare"), Tyco International, Inc., Tyco International (USA), and Tyco International (U.S.) Inc. ("Tyco U.S."). Specifically, Plaintiff alleged (1) that Defendants infringed its federal trademark, TYCOS®, in violation of 15 U.S.C. § 1114, (2) that Defendants engaged in unfair competition in violation of 15 U.S.C. § 1125(a), (3) that Defendants diluted its TYCOS trademark in violation of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c), (4) that Defendants engaged in unlawful trade practices in violation of § 360–l of New York General Business Law, and (5) that Defendants engaged in unfair competition under New York common law.

In response to Plaintiff's complaint, Defendants Tyco Services, Tyco U.S. and Tyco Healthcare, all of whom are subsidiaries of Tyco International, asserted six counterclaims.[1] The first five counterclaims seek a judgment declaring (1) federal trademark non-infringement, (2) the absence of federal trademark dilution, (3) state and common-law trademark non-infringement, (4) absence of federal, state and common-law unfair competition, and (5) absence of consumer confusion or risk

1. Tyco International is a diversified manufacturing and services conglomerate with operations in more than eighty countries. *See* Answer, Tyco's Counterclaims, at ¶ 4.

thereof. The sixth counterclaim seeks partial cancellation of U.S. Registration No. 79,377 for all listed goods except those for which the TYCOS mark is in active use, that is, sphygmomanometers and stethoscopes.

Presently before the Court is Plaintiff's motion pursuant to Rule 65(a) of the Federal Rules of Civil Procedure for an order preliminarily enjoining Defendants from using the Tycos trademark or any similar designation, including "Tyco," on medical products.

## II. BACKGROUND

Plaintiff is a New York corporation that manufactures and markets medical and industrial diagnostic instruments and specialty lamps. *See* Complaint at ¶¶ 5, 14. Since at least 1908, high quality medical products, including blood pressure instruments (sphygmomanometers) and stethoscopes have been manufactured, marketed, distributed and sold under the Tycos trademark. *See id.* at ¶ 16. Plaintiff owns and has registered the Tycos trademark in the United States [2] and in foreign countries. *See id.* at ¶¶ 17–18. Plaintiff asserts that healthcare providers around the world recognize the trademark and rely on TYCOS® instruments for accuracy, quality and reliability. *See id.* at ¶ 22. The Tycos trademark is a source of good will toward Plaintiff and its products. *See id.* at ¶ 21.

2. Plaintiff is the owner by assignment of United States Registration No. 79,377 in U.S. class 26 (measuring and scientific appliances) for "hydrometers, pyrometers, thermographs, charts for recording thermometers, barometers, and gages; anemometers, compasses, draft-gages, gas-pressure gages, levels, rain-gages, sunshine-recorders, urinometers, barometers, clinometers, flash-test apparatus, hygrometers, vacuum-gages, meteorological instruments, and sphygmomanometers," and United States Registration No. 968,723 in

On November 24, 1999, Defendant Tyco Services filed "Intent to Use" applications to use the mark Tyco with respect to a variety of products in the medical industry. *See id.* at ¶ 28. The Patent and Trademark Office ("PTO") rejected the application on May 22, 2000, finding that the mark "so resembles" Plaintiff's Tycos mark "as to be likely to cause confusion, or to cause mistake, or to deceive." *See id.* On Defendants' request for reconsideration on November 22, 2000, the PTO adhered to its decision. *See id.* at ¶¶ 29–30.

On December 14, 2001, the Court [3] granted Plaintiff's application, submitted the previous day, for an Order to Show Cause bringing a motion for an order preliminarily enjoining and restraining Defendants, their officers, agents, employees, associates and those acting in concert and participation with them:

(i) from using the TYCOS® trademark, or any colorable imitation, counterfeit or copy of any confusingly similar designation, including, but not limited to TYCO, as a name, name component, trademark or otherwise on medical products;

(ii) from using the TYCOS® trademark, or any colorable imitation, counterfeit or copy of any confusingly similar designation, including, but not limited to TYCO, as a name, name component, trademark or otherwise to identify, market, advertise, promote, distribute or sell medical products;

U.S. class 44 (dental, medical & surgical appliances) for "medical instruments." *See* Answer, Tyco's Counterclaims, at ¶ 15.

3. At the time that Plaintiff brought its motion by Order to Show Cause, this case was assigned to Judge Mordue. Due to a conflict of interest, Judge Mordue recused himself and the matter was reassigned to Chief Judge Scullin on March 11, 2002. *See* Dkt. No. 63.

(iii) from engaging in any activity likely to cause confusion, mistake, deception or misunderstanding as to the source, affiliation, connection or association of Defendants and/or their products with medical products sold under plaintiff's TYCOS® trademark;

(iv) from committing any other acts calculated to cause, or likely to cause purchasers or prospective purchasers to believe that any product of defendants is that of plaintiff's or is sponsored or otherwise approved by plaintiff, or that any product of plaintiff's is that of defendants or is sponsored or otherwise approved by defendants;

(v) from expressly or impliedly representing themselves to customers or to prospective customers as being affiliated in any way with Welch Allyn;

(vi) from passing off defendants' medical products as those of Welch Allyn or otherwise unfairly competing with Welch Allyn in any manner whatsoever;

(vii) from otherwise infringing or diluting the TYCOS® trademark;

(viii) to issue and pay for corrective advertising; and

(ix) such other and further relief and [sic] the Court deems just and proper.

*See* Order to Show Cause, Dkt. No. 2, at 2–3.

The following constitutes the Court's written decision with respect to Plaintiff's motion.

## III. DISCUSSION

### A. Preliminary injunction standard

In order to obtain a preliminary injunction where a party seeks to maintain the *status quo*, that party must demonstrate 1) that it is subject to irreparable harm; and 2) either a) that it will likely succeed on the merits or b) that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships tips "decidedly" in favor of the moving party. *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir.1997) (citation omitted).[4]

■ As a general rule in trademark cases, "a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm[.]" *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988) (citations omitted).

In the present case, to support its request for a preliminary injunction, Plaintiff has focused on showing a likelihood of confusion. To that end, Plaintiff has submitted, among other things, several declarations, including that of Edward Wright, the General Manager of its Blood Pressure Products, outlining Plaintiff's history, in particular its sales of Tycos products and Defendants' expansion into the healthcare field, beginning in the mid–1990s when Tyco International expanded its "growth through acquisition" strategy to target the healthcare industry. *See generally* Declaration of Edward Wright, dated December

---

**4.** The parties agree that this is the appropriate standard that the Court should apply in this case. It is arguable, however, that the injunctive relief that Plaintiff seeks will alter, rather than maintain, the *status quo*, by requiring Defendants to cease using the Tyco/Healthcare mark which they have used for years on certain medical products and that Plaintiff should, therefore, be required to meet the more stringent standard for a mandatory injunction. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–35 (2d Cir.1995). It is not necessary for the Court to address this issue, however, because even under the more relaxed prohibitory-injunction standard, Plaintiff has not demonstrated entitlement to a preliminary injunction.

11, 2001 ("Wright Decl."). In addition, Plaintiff maintains that, thereafter, Tyco International acquired numerous manufacturers and suppliers of a broad range of medical products, including vital signs products.[5] In his declaration, Mr. Wright states that Tyco International's Chairman and Chief Executive Officer, L. Dennis Kozlowski, announced to shareholders in his December 8, 2000, annual report that the company planned to pursue a new branding strategy using TYCO:

> We also have another great but underutilized brand name: "Tyco." In fiscal 2000, we began adding the Tyco name to all our packaging, and we expect that this will gradually lead to greater recognition of the Company and to increased sales, especially to institutions that want to make bundled purchases.

See id. at ¶ 45 and Exhibit 19.

In response to Plaintiff's submissions, Defendants submitted, among other

things, the declaration of Judith Czelusniak, Senior Vice President of Corporate Relations for Tyco U.S., in which she states that "[b]y the end of 2000, Tyco Healthcare's packaging and catalogs increasingly featured the TYCO/HEALTHCARE house mark [and that] [b]illions of dollars of products have been sold in packaging" bearing that mark. See Declaration of Judith Czelusniak, dated January 8, 2002, at ¶ 5.

Defendants also submitted the declaration of Paul Latka, Director of Sales and Marketing—Ludlow OEM for Defendant The Ludlow Company LP ("Ludlow"), outlining the development of Defendants' use of the name Tyco on medical products, beginning in 1995, when the products and advertisements distributed by the Kendall and UniPatch brands included the "tag line": "A Tyco International Ltd. Company."[6] See generally Declaration of Paul

---

5. According to Mr. Wright, "[i]n 1994, Tyco [International] bought Classic Medical, Uni–Patch and Promeon, three providers of disposal [sic] medical products or supplementary products[,]" as well as Kendall International Company, one of "the world's largest manufacturers and distributors of medical supplies, including blood collection products (e.g., blood tubes, serum separator tubes, needles, syringes and lancets), thermometers, airway management and diagnostic products, vascular therapy products, and wound care products." See Wright Decl. at ¶¶ 35–36. In 1996, Tyco International "acquired Professional Medical Products, Inc., makers of adult incontinence products and other disposal [sic] medical products." See id. at ¶ 38. In 1997, Tyco International "bought INBRAND, another manufacturer and distributor of adult incontinence products." See id. In 1998, Tyco International "bought Sherwood Davis & Geck, a large manufacturer and distributor of a variety of medical products, including thermometers, wound care products, tubes, catheters, needles and syringes, and enteral feeding systems." See id. at ¶ 39. In 1998, Tyco International "also bought United States Surgical, a maker of surgery devices and systems." See id. In 2000, Tyco International

"bought General Surgical Innovations, another medical manufacturer and distributor of dissection products used in minimally invasive surgical procedures." See id. at ¶ 40. In October 2000, Tyco International "bought Mallinckrodt, Inc., a global manufacturer of numerous medical products, including respiratory care and diagnostic instruments such as spirometers for measuring pulmonary function, flow meters for monitoring asthma, oximeters for measuring blood oxygenation, and multiparameter vital sign monitors for taking vital sign measurements in adult and pediatric patients." See id. at ¶ 41. According to Tyco International's fiscal 2000 annual report, "the Mallinckrodt transaction made Tyco 'the world's second largest producer of medical devices.' " See id. at ¶ 42 and Exhibit 19. The report also states that Tyco International's "sales of healthcare and specialty products grew 13% in 2000, to a total of $6.5 billion." See id.

6. Latka states that in 1995 and 1996, "Ludlow LP distributed at least two dealer product catalogs from its Uni–Patch group that included the Tyco corporate name tag line on the back covers." See Latka Decl. at ¶ 8. "The

Latka, dated January 8, 2002 ("Latka Decl."). Latka further states that "[b]eginning in 2000, Kendall–LTP adopted the TYCO/HEALTHCARE mark on all of its packaging and advertisement" and has consistently used the mark since that time. *See id.* at ¶ 11.

In light of these submissions and their respective arguments, the Court will address each of the claims for which Plaintiff seeks a preliminary injunction.

## B. Trademark infringement

### 1. *Likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation*

■■■ To establish a trademark infringement claim under the Lanham Act, a plaintiff must show that the defendant used in commerce, without the plaintiff's consent, a "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection **with which such use is likely to cause confusion,** or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1)(a) (emphasis added). "To prevail under this statute, the plaintiff must show that 'it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion.'" *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 477 (2d Cir.1996) (quoting *Grun-*

er + *Jahr USA Publishing v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir.1993)).

■■ The seminal case in the Second Circuit dealing with trademark confusion is *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961). The *Polaroid* court enunciated eight factors to aid courts in evaluating the likelihood of marketplace confusion in trademark disputes involving products which do not directly compete. *See id.* These factors are:

(1) the strength of the plaintiff's mark or dress; (2) the similarity between the two marks or dresses; (3) the proximity of the products in the marketplace; (4) the likelihood that the prior owner will bridge the gap between the products; (5) evidence of actual confusion; (6) the defendant's bad faith; (7) the quality of the defendant's product; and (8) the sophistication of the relevant consumer group.

*Paddington Corp. v. Attiki Importers & Distribs., Inc.,* 996 F.2d 577, 584 (2d Cir. 1993) (citing *Bristol–Myers Squibb,* 973 F.2d at 1043; *Hasbro,* 858 F.2d at 75).[7]

The Court will address each of the *Polaroid* factors in the context of the present case.

### a. *First Polaroid factor—strength of Plaintiff's mark*

■■■ The first *Polaroid* factor, the strength of Plaintiff's mark, "refers to a

---

products listed in catalogs include ECG electrodes, TENS electrodes, leadwires, clips, paper, Holter Kit equipment, cremes/gels, and towelets." *See id.* "In 1997, the Kendall–LTP group distributed a Cable & Leadwire catalog that included the Tyco corporate tag line at the bottom of every page." *See id.* at ¶ 9. "These products are used to connect electrodes and electromedical equipment." *See id.* "In 1998 and 1999, Kendall–LTP distributed a number of different sell sheets for neonatal supplies, solid gel electrodes, and wet gel electrodes." *See id.* at ¶ 10. These

sheets bore the Tyco corporate tag line at the bottom below the Kendall name. *See id.*

7. The *Polaroid* list is not exclusive, and evaluation of the factors is not a mechanical process. "Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Paddington Corp.,* 996 F.2d at 584 (citing *Lang v. Retirement Living Publishing Co.,* 949 F.2d 576, 580 (2d Cir. 1991)).

mark's 'tendency to identify the goods sold under the mark as emanating from a particular ... source.'" *Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 391 (2d Cir.1995) (quoting *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979)). "[A] mark's strength is assessed using two factors: (1) the degree to which it is inherently distinctive; and (2) the degree to which it is distinctive in the marketplace." *W.W.W. Pharm. Co., Inc. v. Gillette Co.,* 984 F.2d 567, 572 (2d Cir.1993) (citation omitted). "[W]hen a mark is registered and fanciful, the plaintiff has 'met its burden' on the question of strength." *Cadbury Beverages,* 73 F.3d at 479 (citation omitted). In cases such as the present one, where the parties' goods do not compete directly, a court may also properly consider "the recognition that the mark actually enjoys in the marketplace[.]" *Id.* (citing *McGregor–Doniger,* 599 F.2d at 1132–33).

■ The name Tycos, which is entirely fanciful and bears no logical relationship to medical products, is an inherently distinctive mark. Thus, Plaintiff has demonstrated that Tycos is a strong mark. However, with respect to its distinctiveness in the marketplace, the extensive use of the word Tyco by Defendants and Mattel Toys, Inc. weighs against a finding that the Tycos mark is distinctive in the general marketplace. *See W.W.W. Pharm.,* 984 F.2d at 573. Although Plaintiff has established that the Tycos mark is widely recognized in the narrow field of stethoscopes and sphygmomanometers,[8] it has not adduced evidence that Tycos' distinctiveness extends beyond that narrow field into the broader field of medical products to any substantial extent. Nonetheless, due to the inherent distinctiveness of the Tycos mark, this factor favors Plaintiff to a significant degree, but only with respect to the narrow field of stethoscopes and sphygmomanometers.

### b. Second *Polaroid* factor—similarity between marks

■ Under the second *Polaroid* factor, the Court considers whether the similarity of the marks is likely to provoke confusion among potential customers. The Court therefore looks at " 'all factors that could reasonably be expected to be perceived by and remembered by potential purchasers.'" *Arrow Fastener,* 59 F.3d at 394 (quoting *McGregor–Doniger,* 599 F.2d at 1133). The Court must " 'appraise the overall impression created by ... the context in which [the marks] are found[.]'" *Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 47 (2d Cir.2000) (quoting *Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 744 (2d Cir.1998) (internal quotation marks omitted)) (other citations omitted); *see also Federal Express Corp. v. Federal Espresso, Inc.,* No. CIVA97CIV1219, 1998 WL 690903, *13 (N.D.N.Y. Sept. 30, 1998), *aff'd,* 201 F.3d 168 (2d Cir.2000). " '[S]imilarity "is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." '" *Federal Express,* 1998 WL 690903, at *13 (quoting *Arrow Fastener,* 59 F.3d at 395 (quoting Restatement of Torts § 729 cmt. b (1938))).

Plaintiff points to the obvious similarity between the words Tyco and Tycos and urges the Court to find, as did the PTO, that the marks are "nearly identical." On the other hand, Defendants have introduced undisputed evidence that they al-

---

8. According to Mr. Wright, "TYCOS commands more than 30% of the market share (in dollars) for aneroid sphygmomanometers (23% worldwide), and TYCOS is the number two most widely used brand of professional grade stethoscopes." *See* Reply Declaration of Edward Wright, dated January 14, 2002, at ¶ 5.

ways use the mark Tyco/Healthcare or the corporate tag line ("A Tyco International Ltd. Company")—never just the word Tyco—on their products and packaging and that the mark Tyco/Healthcare or the corporate tag line are always used in combination with the primary trademark specific to each particular product, e.g., Kendall. Moreover, the typefaces are distinctive; Tycos is written in script with an "upper-case T," whereas in the Tyco/Healthcare mark, Tyco and Healthcare are written in block letters, and Tyco begins with a "lower-case t."

Based upon the information in the record,[9] the Court finds that the total effect of the marks is somewhat—but not strongly—similar. Therefore, this factor favors Plaintiff to a limited degree.

### c. Third Polaroid factor—proximity of the products in the marketplace

 The third *Polaroid* factor—the proximity of the products in the marketplace—"is concerned with the competitive distance between the products." *Arrow Fastener*, 59 F.3d at 396 (citing *McGregor–Doniger*, 599 F.2d at 1134). The Court considers "whether the two products compete with each other[,]" or whether they " 'serve the same purpose, fall within the same general class, or are used together[.]' " *W.W.W. Pharm.*, 984 F.2d at 573 (quotation omitted). It is undisputed that the parties do not sell identical products or products that serve the same purpose, and thus they do not directly compete with each other for the same sales.[10] This lack of direct competition does not, however, vitiate the concern that " ' "customers may be confused as to the *source* of the products, rather than as to the products themselves." ' " *Arrow Fastener*, 59 F.3d at 396 (quoting *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1134 (2d Cir.1982) (quoting *McGregor–Doniger*, 599 F.2d at 1134–35)).

Plaintiff argues that the products fall within the same general class and are pro-

**9.** In its reply, Plaintiff characterizes the word "Healthcare" in Tyco/Healthcare as merely descriptive and points out that " ' "one may not appropriate the entire mark of another and avoid a likelihood of confusion by the addition thereto of descriptive or otherwise subordinate matter." ' " *See* Plaintiff's Reply Memorandum of Law at 5 (quoting *American Express Co. v. American Express Limousine Serv. Ltd.*, 772 F.Supp. 729, 733 (E.D.N.Y. 1991) (quoting *Bellbrook Dairies, Inc. v. Hawthorn–Mellody Farms Dairy, Inc.*, 45 C.C.P.A. 842, 253 F.2d 431, 432 (Cust. & Pat.App. 1958))); *accord In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1407 (Fed.Cir.1997) (finding that the mark "THE DELTA CAFÉ" and the design for "restaurant services specializing in Southern-style cuisine" were likely to cause confusion with the registered mark DELTA for hotel, motel and restaurant services).

The acquired meaning of the word "healthcare" in the marketplace is not explained on the record; it would appear, however, on this preliminary record that Defendants' mark, Tyco/Healthcare, using the slash and the word Healthcare (which has not been shown to describe a particular product or category of product), is not tantamount to merely adding descriptive matter to Plaintiff's mark. Thus, it would appear that the combination of Tyco with Healthcare in the Tyco/Healthcare format is less confusingly similar to the Tycos mark than would be the combination of Tyco with a descriptive name of a product or a category of products to create a mark such as Tyco Thermometer or Tyco Diagnostic Instruments. However, in view of the lack of information as to the acquired meaning of the word healthcare, the Court cannot evaluate whether or not the addition of the word healthcare to a mark is tantamount to the mere addition of descriptive or otherwise subordinate matter as in the above-cited cases.

**10.** At oral argument, Plaintiff withdrew its allegation that Mallinckrodt, Inc., which Defendants acquired in 2000, manufacturers and distributes sphygmomanometers. *See* Transcript of Oral Argument, dated January 22, 2002, Dkt. No. 59.

moted through the same trade channels, thus presenting a likelihood of confusion as to their source. However, the record contains little evidence concerning the nature of the medical products market. It appears on this preliminary record that many of the medical products that Defendants market are disposable items or small items purchased in bulk, although other products Defendants market, such as Mallinckrodt diagnostic devices, may be somewhat similar to stethoscopes and sphygmomanometers. Plaintiff, however, has not presented evidence which would support a finding that Defendants' products fall within the same general class or are sold through the same trade channels as stethoscopes and sphygmomanometers. *See, e.g., Arrow Fastener*, 59 F.3d at 396–97 (finding that proximity factor did not favor the plaintiff although both products were staplers and were sometimes sold in the same stores; the court noted that the plaintiff's product did not have broad reach into market and that products differed in function and price); *W.W.W. Pharm.*, 984 F.2d at 573–74 (finding that proximity factor did not favor the plaintiff although both products were personal care products and shared some channels of trade; products did not compete nor serve the same purpose and were not displayed in the same areas of food or drug stores); *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205–09 (1st Cir.1983) (finding no likelihood of confusion between pharmaceutical drug and computerized blood analyzer machine despite fact that both used similar marks and were marketed in medical or health care field; court considered dissimilarity of goods, diverse channels of trade, differences in markets, and sophistication of purchasers). Thus, the Court concludes that Plaintiff has not presented sufficient evidence to suggest that this factor weighs in its favor.

### d. Fourth Polaroid factor—bridging the gap

The fourth *Polaroid* factor is designed to protect Plaintiff's interest in being able to enter a related field at some future time. *See W.W.W. Pharm.*, 984 F.2d at 574. Although Plaintiff does have an interest in the medical products field arising from its trademark registrations, Plaintiff has made no showing that it intends—in the near or distant future—to expand in that field. Therefore, the Court concludes that on the present record this factor favors Defendants.

### e. Fifth Polaroid factor—actual confusion

The fifth *Polaroid* factor is actual confusion. "For purposes of the Lanham Act, actual confusion means 'consumer confusion that enables a seller to pass off his goods as the goods of another.'" *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir.1996) (quoting *W.W.W. Pharmaceutical*, 984 F.2d at 574 (quotation omitted)). "[T]he relevant confusion is that which affects 'the purchasing and selling of the goods or services in question[;]' ... 'trademark infringement protects only against mistaken purchasing decisions and not against confusion generally.'" *Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2d Cir.1991) (internal quotation and other quotation omitted). Thus, a plaintiff must demonstrate "commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Id.*

Plaintiff's evidence of confusion depends entirely upon the declarations of Plaintiff's employees, a fact that somewhat weakens

their probative value.[11] In reviewing Plaintiff's submissions on this issue, the

11. To support its claim of actual confusion, Plaintiff relies upon the declaration of Thomas J. Grant, Marketing Manager for its Core Blood Pressure business group, stating that he recently "learned from a number of Welch Allyn sales and customer service representatives", about incidents of "actual confusion between Welch Allyn's TYCOS® brand products and the defendant's [sic] and their products." *See* Declaration of Thomas J. Grant, dated December 12, 2001 ("Grant Decl."), at ¶ 3. In his declaration, Mr. Grant states:

(a) on or about November 23, 2001, an individual employed by CII in Fairview, was inquiring about Tycos as a company. He said CII had just been purchased by Tyco, and he thought it was the same company I work for. I explained that Tycos is a trademark for a sphygmomanometer, and we are a Welch Allyn company, and that Tycos is totally unrelated.

(b) a customer at the American Heart Association ("AHA") show held on Nov. 11–14, 2002[sic] in Anaheim, California, came to our booth with Tyco literature asking about the Tyco product, thinking Welch Allyn owned Tyco.

(c) at a recent symposium for clinical engineers, one of Welch Allyn's sales people was required on multiple occasions to explain that Tyco and TYCOS are different companies and are not associated in any manner[.]

(d) a customer . . . remarked that he was familiar with TYCOS because he had seen the Tyco office building in Boca Raton and because Tyco is the company that monitors his home and office security systems. The customer was confused: both were references to defendants, not Welch Allyn's TYCOS.

(e) on November 29, 2001 a customer called looking for a Tyco drain sponge. Welch Allyn does not make drain sponges; instead it was a product of the defendant.

(f) an intern from Colorado called on November 25, 2001 looking for a TYCOS stethoscope. He advised that it had taken him over five days to come up with the right telephone number to call. The intern advised that the telephone information service gave him the telephone number for Tyco Healthcare, not Welch Allyn. He also advised that he was unsuccessful in obtaining the correct number from the internet yellow pages or a local distributor.

(g) one customer expressed surprise that Welch Allyn was selling fire alarms. In fact, Welch Allyn does not sell fire alarms; the defendant does.

*See id.* at ¶ 3(a)–(g).

Plaintiff also submitted the declaration of Paul Kessler, one of its hospital sales representatives, stating that he received a telephone call from Keith Nishimura, a buyer in the purchasing department of the Kapiolani Medical Center in Hawaii, who stated that he wanted to buy a TYCOS sphygmomanometer but had encountered difficulty in locating a company from which he could purchase it. *See* Declaration of Paul Kessler, dated December 11, 2001, at ¶ 4. Mr. Nashimura had called Tyco's Kendall division and had spoken with several people and had finally been told to call TYCOS. *See id.* In another declaration, Steven Bakalar, one of Plaintiff's sales representatives, stated that during 2001 he "had two instances where customers confused TYCOS and TYCO. In one instance the customer questioned how Welch Allyn could own a multi-billion dollar international company. In the other instance, the customer confused TYCOS with defendants because he had a TYCO security system." *See* Declaration of Steven Bakalar, dated January 14, 2002, at ¶ 2. In addition, Kathleen D. Miles, one of Plaintiff's senior customer service representatives, stated in her declaration that "[o]n January 15, 2001, Theresa Thomas from the Medical Center of Southeast Oklahoma called looking to purchase butterfly bandages. [Ms. Thomas] explained that she had gotten our number from a medical distributor. She had asked the distributor for the number of Tyco and was given [Welch Allyn's] number instead." *See* Declaration of Kathleen D. Miles, dated January 18, 2001[sic], at ¶ 2.

Plaintiff has also submitted additional declarations, including one from Paul DuBois, one of Plaintiff's sales representatives, stating that he "can recall between five and eight instances during 2001 when customers on whom [he] called confused TYCO with TYCOS. Some thought TYCOS was part of TYCO/TYCO Healthcare, and some expressed concern about purchasing product from TYCO." *See* Declaration of Paul DuBois, dated January 14, 2001[sic], at ¶ 2. In another declaration, Cindy Paddock, a Registered Nurse who works for Plaintiff, stated that "[o]n November 29, 2001, I received a tele-

Court notes that the great majority of instances of alleged confusion do not clearly involve potential purchasers of Plaintiff's products or others whose confusion could result in commercial injury.[12] *See, e.g.*, the Declarations of Steven Bakalar, Paul DuBois, Michael Rybarczyk, Charlie Jerry Howard and William Nedvidek and items (a), (b), (c), (d), and (g) of the Grant Decl., summarized at n. 11, *supra*. Item (f) of Mr. Grant's declaration describes a potential purchaser of a Tycos stethoscope who stated to one of Plaintiff's employees that "it had taken him over five days to come up with the right telephone number to call," that the telephone information service gave him the number for Tyco Healthcare, and that he was unsuccessful in obtaining the correct number from the internet yellow pages or a local distributor. There is also some evidence of confusion on the part of potential purchasers of Defendants' products: item (e) of Mr. Grant's declaration indicates that a telephone operator gave Plaintiff's telephone number to a potential purchaser of Defendants' products; Kathleen D. Miles relates an instance of confusion on the part of a potential purchaser of Defendants' products due to receiving the wrong telephone number from a medical distributor, and Cindy Paddock states that she received a telephone call from someone seeking a Tyco drain sponge, which Defendants sell.

Even accepting as true all of Plaintiff's factual submissions on this factor, the Court finds that, although somewhat supportive of the claim that the similarity in the two names has caused some general confusion and some confusion among the people working in the healthcare field, Plaintiff's submissions do not support a finding of significant confusion in the minds of people directly involved in the decision to buy stethoscopes and sphygmomanometers or other products that Plaintiff presently manufactures and sells. *See* n. 11 *supra*.

The Court recognizes the difficulty of obtaining this type of evidence, particularly at this preliminary stage of the proceeding. Thus, despite the weakness of the evidence of actual confusion, the Court finds that this factor favors neither Plaintiff nor Defendants.[13]

phone call from an individual seeking a Tyco drain sponge; he was confused between TYCOS and Tyco and thought Welch Allyn was Tyco." *See* Declaration of Cindy Paddock, dated January 14, 2001[sic], at ¶ 2. A declaration from Michael Rybarczyk, one of Plaintiff's sales representative, stated that "[o]ver the past several months I have been asked on multiple occasions whether Welch Allyn was bought out by Tyco." *See* Declaration of Michael Rybarczyk, dated January 14, 2001[sic], at ¶ 2. Also, Charlie Jerry Howard, one of Plaintiff's Engineering Managers, stated in his declaration that "[i]n the beginning of December 2001 I received a telephone call from a headhunter who thought [Plaintiff was] owned by TYCO. He stated his belief that TYCOS comes from TYCO and was surprised to learn otherwise." *See* Declaration of Charlie Jerry Howard, dated January 14, 2001[sic], at ¶ 2. William Nedvidek, Plaintiff's Southern Regional Manager, stated in his declaration that "[d]uring a trade event during the fall of 2001, a potential customer came up to me at my booth and with disdain in his voice made a comment to me about 'laying a bunch of people off.' After discussion, I learned that he was confusing TYCOS with TYCO." *See* Declaration of William Nedvidek, dated January 14, 2001[sic], at ¶ 2.

12. The Court does not consider the references to "customers" in Plaintiff's declarations, without more, as designating potential purchasers of Tycos products.

13. In any event, in view of the lack of proof regarding the nature of the market and the characteristics of the purchasers, the Court cannot assess the significance of particular instances of confusion or lack of confusion. For this reason, it is not necessary for the Court to address Defendants' submissions on this issue.

#### f. Sixth Polaroid factor—bad faith

■ Plaintiff claims that Defendants' bad faith may be inferred from Defendants' persistence in using the Tyco/Healthcare mark even after the PTO rejected its application. The issue of likelihood of confusion, however, cannot be resolved merely by reference to a PTO registration determination. Rather, the district court must independently " 'determine . . . the likelihood of consumer confusion as to the source of the goods, . . . with this . . . issue to be resolved . . . by application of the multi-factor balancing test set forth in Polaroid . . .' " Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 743–44 (2d Cir.1994) (quoting Goya Foods, 846 F.2d at 854 (internal citations omitted)). Moreover, prior knowledge of a senior user's trade mark does not, without more, support an inference of bad faith. See Arrow Fastener, 59 F.3d at 397. There is nothing in the record to support a finding that Defendants " 'adopted [their] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [defendants'] and [plaintiff's] product.' " W.W.W. Pharm., 984 F.2d at 575 (quoting Lang, 949 F.2d at 583 (quoting Edison Bros. Stores, Inc. v. Cosmair, Inc., 651 F.Supp. 1547, 1560 (S.D.N.Y. 1987))). Indeed, it is questionable whether Defendants stood to gain by creating confusion between their mark and Plaintiff's; according to Mr. Wright, Plaintiff's sales of Tycos products have averaged about $22 million for each of the last five years, whereas Tyco/Healthcare sales in the year 2000 were about $6.5 billion. See Wright Decl. at ¶ 42 and Exhibit 19. Moreover, Defendants have demonstrated their increasing use of the Tyco name since 1995 in furtherance of their plan to add the Tyco name to all their packaging, with the expectation, as Mr. Kozlowski stated, that the increased use "will gradually lead to greater recognition of the Company and to increased sales[.]" See Wright Decl. at

Exhibit 19. This explanation for Defendants' increased use of the Tyco mark is plausible, supported by the evidence, and unrefuted. Although it is true that, frequently, questions of motivation and intent are not susceptible to resolution on papers, the record as it now stands does not present any questions relevant to this issue that would warrant a hearing. Considering the entire record, therefore, the Court finds that this factor favors Defendants.

#### g. Seventh Polaroid factor—quality of Defendants' products

With respect to the seventh Polaroid factor, the quality of Defendants' products, Plaintiff submits that in a recent trade magazine Defendants' contract service performance received "mixed marks" and that Defendants have been sued in product liability cases concerning their needles, syringes and latex products. Plaintiff does not sell under the Tycos name these or any other products that Defendants sell. Plaintiff is, however, legitimately concerned to protect the reputation for high-quality products and service associated with the Tycos mark. Moreover, it is undisputed that there has recently been nationwide negative publicity concerning Defendants' alleged improprieties in accounting practices and other financial matters. In light of this publicity, Plaintiff is also concerned about protecting its corporate reputation. Even accepting the truth of Plaintiff's submissions, however, the Court finds that the record does not suggest that Defendants' activities have significantly threatened the high reputation of Tycos products or that Plaintiff is otherwise significantly threatened in this regard. Therefore, the Court finds that this factor does not favor Plaintiff.

#### h. Eighth Polaroid factor—sophistication of relevant consumers

■ The final Polaroid factor is the sophistication of relevant consumers.

Plaintiff urges that purchasers such as physicians, hospital purchasing agents, and health care workers are not "trademark experts" and are not immune from confusion and mistake. On the other hand, it appears that they are not casual or "impulse" purchasers. It seems more likely that they are similar to retailers, who are "assumed to be more sophisticated buyers and thus less prone to confusion[,]" *W.W.W. Pharm.*, 984 F.2d at 576 (citation omitted), particularly where, as here, it appears that they are professionals purchasing fairly expensive, specialized products for long-term use. In any event, Plaintiff has not produced evidentiary proof regarding the characteristics of the relevant consumers, and the record does not present material questions of fact on this issue. Therefore, the Court concludes that on the present record this factor does not favor Plaintiff.

In sum, based upon the evidence before it, the Court has found that the strength of Plaintiff's mark favors Plaintiff to a significant degree, and the similarity of the marks favors Plaintiff to a limited degree. The factors of bad faith and the likelihood of bridging the gap favor Defendants, while the remaining factors have not been shown to clearly favor Plaintiff.

In attempting to address Plaintiff's claims, the Court is hampered by the lack of evidence regarding the characteristics of the relevant purchasers and the nature and extent of the medical products marketplace, both generally and in relation to the parties' products.[14] Without a clear understanding of these factors, the Court cannot thoroughly evaluate the proximity of the products in the marketplace, the sophistication of the relevant purchasers or the significance of the evidence of actual confusion. These issues bear heavily on the ultimate question of the likelihood of confusion, particularly here where specialized products and markets are in issue. *See, e.g., Astra Pharmaceutical*, 718 F.2d at 1205–09 (no likelihood of confusion between pharmaceutical drug and computerized blood analyzer machine despite fact that both use similar marks and are marketed in medical or health care field; court considers dissimilarity of goods, diverse channels of trade, differences in markets, and sophistication of purchasers). In view of this lack of evidence regarding the characteristics of the purchasers and the nature and extent of the marketplace for these specialized medical products, the Court finds that Plaintiff has not carried its burden to demonstrate a likelihood of confusion.[15]

14. Mr. Wright's declaration contains extensive information regarding Plaintiff's business and Defendants' expansion into the medical products field, but this evidence does not enable the Court to put this information into perspective in the context of the overall market.

15. Plaintiff has requested a hearing on its motion. A hearing is necessary "where 'essential facts are in dispute[.]'" *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745, 747 (2d Cir.1987) (quotation omitted). Where, however, a plaintiff's factual submissions, even if accepted as true, do not warrant injunctive relief, there are no "essential" facts in dispute and, therefore, a hearing would

serve no purpose. *See generally SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 360–61 (2d Cir. 1974); *A. Nelson & Co. Ltd. v. Ellon USA, Inc.*, No. 95 CIV. 3696, 1996 WL 288214, *2 (S.D.N.Y.1996). The Court does not read Rule 65 or the case law interpreting that rule to require the Court to afford a hearing to every party that moves for a preliminary injunction. *See Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 256 (2d Cir. 1989). Nor should a hearing be viewed as an opportunity for a plaintiff to remedy inadequacies in its moving papers. Therefore, in the present case, the Court's determination that Plaintiff has not submitted sufficient evidence to support a resolution of the *Polaroid* inquiry in its favor does not mean that Plain-

## 2. Balancing of equities

■ Even if the *Polaroid* factors weighed more in Plaintiff's favor, equitable factors would weigh against an award of injunctive relief on this cause of action. As Scott Pleau's declaration demonstrates, a preliminary injunction would greatly harm Defendants.[16] The Court has found no evidence of bad faith on the part of Defendants. In considering the benefit to Plaintiff, it is significant that there is no direct competition between the parties' products, no evidence of actual lost sales, and only weak evidence of actual confusion. As Judge Learned Hand explained, where the parties are not in direct competition for the same sales, the trademark owner's only interest in preventing a use of his mark which may create confusion as to a product's source is that "he may wish to preempt the market for later exploitation, or not to expose his reputation to the hazard of the newcomer's business practices, or both. . . . [T]hese interests yield much more readily to any conflicting interests of the newcomer than when he invades an existing market." *Dwinell–Wright Co. v. White House Milk Co.*, 132 F.2d 822, 825 (2d Cir.1943). Particularly

where, as here, there is no evidence that Plaintiff intends to bridge the gap into the broader field of medical products and little evidence of danger to Plaintiff's reputation, an injunction would greatly harm Defendants without giving Plaintiff much benefit. *See generally W.W.W. Pharm.*, 984 F.2d at 576.

In sum, the Court concludes that Plaintiff has failed to demonstrate a likelihood of confusion and, thus, either a likelihood of success or sufficiently serious questions going to the merits, with respect to its trademark infringement claim regarding those products in conjunction with which Defendants currently use the trademarks Tyco/Healthcare or Tyco. Therefore, with respect to those products, the Court denies Plaintiff's motion for a preliminary injunction.[17]

■ On the other hand, the Court concludes that maintenance of the *status quo* is important and that to permit Defendants to expand the use of their mark in the medical products market would raise sufficiently serious questions going to the merits of the issue of likelihood of confusion and is likely to tip the balance of the

---

tiff is entitled to a hearing; rather, it simply means that Plaintiff has not carried its initial burden of demonstrating a likelihood of confusion warranting preliminary injunctive relief.

16. Scott Pleau, Manager of Packaging Development for Tyco Healthcare Group LP, states in his declaration that "[i]f Defendants were to be enjoined from the use of TYCO/HEALTHCARE on medical products, the loss of goodwill and the associated costs would be devastating." *See* Declaration of Scott Pleau, dated January 8, 2002, at ¶ 3. Mr. Pleau further states that "Defendants currently have tens of millions of dollars of products in inventory which bear the TYCO/HEALTHCARE logo [and] there are millions of dollars of packaging raw materials in inventory." *See id.* at ¶ 4. Finally, Mr. Pleau asserts that "it would take many weeks

and cost millions of dollars to repackage/relabel the products in inventory[;] . . . cost many millions of additional dollars to create new tooling and new packaging materials[;][and] . . . enormous goodwill in the TYCO/HEALTHCARE mark . . . would be destroyed if an injunction were to issue." *See id.* at ¶¶ 5–6.

17. Plaintiff's claim of irreparable harm is based solely upon its argument that there is a likelihood of confusion between its products and those of Defendants. Since the Court has already addressed the issue of confusion with respect to the likelihood-of-success prong of the preliminary injunction standard, it need not do so again. In finding that Plaintiff has not demonstrated a likelihood of confusion, the Court has necessarily concluded that Plaintiff has failed to establish irreparable harm.

equities in Plaintiff's favor. Accordingly, the Court enjoins Defendants during the pendency of this action from expanding their use of the Tyco/Healthcare or Tyco trademark, or any other trademark which uses the word Tyco, in conjunction with any non-disposable medical products or any medical instruments with which Defendants do not currently use those trademarks.

## C. Trademark dilution

### 1. *Preliminary injunction standard*

As it did with respect to its trademark infringement claim, Plaintiff's arguments in support of its motion for a preliminary injunction with respect to its federal and state trademark dilution claims focus exclusively on the likelihood-of-success prong of the preliminary injunction test. Since the Court's resolution of this prong is dispositive, the Court need not reach the irreparable harm and "balancing of the hardships" elements of this test.

### 2. *Federal Trademark Dilution Act*

Plaintiff seeks a preliminary injunction under the Federal Trademark Dilution Act of 1995 ("FTDA"), which provides for injunctive relief to protect the owner of a famous mark "against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive· quality of the mark[.]" 15 U.S.C. § 1125(c)(1). The FTDA defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of" competition or confusion. 15 U.S.C. § 1127 (West Supp.2001) The FTDA provides:

> In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to—

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered . . . .

15 U.S.C. § 1125(c)(1).

In addressing the § 1125(c)(1) factors, the Second Circuit views distinctiveness and fame as two separate factors, thus interpreting clause (A)—the degree of inherent and acquired distinctiveness of the mark—"to invite two inquiries: (1) Has the plaintiff's mark achieved a sufficient degree of consumer recognition ('acquired distinctiveness') to satisfy the Act's requirement of fame? (2) Does the mark possess a sufficient degree of 'inherent distinctiveness" to satisfy the Act's requirement of 'distinctive quality'[?]" *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 98 (2d Cir. 2001); *accord Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 216 (2d Cir.1999) ("It is quite clear that the statute intends distinctiveness, in addition to fame, as an essential element."). Therefore, the Second Circuit in *Nabisco* construed § 1125(c) as

requiring five elements for a dilution claim: "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Nabisco, Inc.*, 191 F.3d at 215.

▆▆▆▆ Plaintiff claims that Defendants' conduct has subjected it to the type of dilution known as "blurring," a process that occurs " 'where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.' " *New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 557 (2d Cir. 2002) (quoting *Deere & Co.*, 41 F.3d at 43 (emphasis omitted)). Injury by blurring may occur in the absence of purchaser confusion as to the product's source. *See Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 175 (2d Cir.2000). A risk of dilution is enough to warrant relief; the FTDA permits injunctions to prevent dilution "before the dilution has actually occurred." *Nabisco, Inc.*, 191 F.3d at 225 (footnote omitted).

▆▆▆▆ With respect to distinctiveness, the first *Nabisco* factor, the Court has found that the fanciful Tycos mark is inherently distinctive. With respect to fame, the second *Nabisco* factor, the Court notes that Tycos is far from being a "household word." *See TCPIP*, 244 F.3d at 99. Plaintiff has not shown that Tycos has acquired distinctiveness in the general marketplace,[18] nor even in the medical products field outside the narrow field of stethoscopes and sphygmomanometers. At best, then, Plaintiff has shown that its mark is famous in only a small segment of the medical products market; this falls far short of a showing that the Tycos mark possesses a "substantial degree of fame" such as would support a finding of dilution under the FTDA. *See id.* (finding that the plaintiff did not demonstrate fame where the plaintiff operated 228 retail stores in twenty-seven states, spent tens of millions of dollars advertising its mark in the past decade, and achieved sales in 1998 of $280 million). While many of the items listed in § 1125(c)(1)(B)–(H) favor Plaintiff,[19] the absence of a showing of the extent of the market in which the Tycos mark is used and of the degree of recognition of the Tycos mark outside that limited market[20] defeats any assertion that Plaintiff has demonstrated that the mark has "achieved a sufficient degree of consumer recognition ('acquired distinctiveness') to satisfy the Act's requirement of fame[.]" *Id.* at 98.

Turning to the other *Nabisco* factors, it is undisputed that the junior use is a commercial use in commerce (third factor). Assuming *arguendo* that Plaintiff's mark is

---

**18.** Indeed, it is probable that any acquired distinctiveness enjoyed by the Tycos mark in the general marketplace has been undermined by the long-term use of the word Tyco by Defendants and by Mattel, Inc.

**19.** The Tycos mark has been registered for an extensive period of time. The duration and extent of use of the Tycos mark in connection with stethoscopes and sphygmomanometers, the duration and extent of advertising and publicity of the Tycos mark, and the geographical extent of the trading area in which the mark is used favor Plaintiff. It appears that Plaintiff also benefits from the degree of recognition of the mark in the trading areas and channels of trade that Plaintiff uses in connection with stethoscopes and sphygmomanometers. *See* 15 U.S.C. § 1125(c)(1)(B)–(D), (F)–(H).

**20.** These factors are pertinent to § 1125(c)(1)(E), (F).

famous, the junior use began after the senior mark became famous (fourth factor).

The fifth *Nabisco* factor is whether the junior use causes dilution of the distinctive quality of the senior mark. The Second Circuit has recently urged a case-by-case approach, noting that it is "early in the collective judicial experience with the FTDA, enacted in 1995, to attempt to fashion a definitive list of factors to be considered[.]" *Federal Express*, 201 F.3d at 176. In *Nabisco*, the Second Circuit analyzed ten factors which "appeared pertinent on the[ ] particular facts:"

 (1) the distinctiveness of the senior mark;

 (2) the similarity of the marks;

 (3) the proximity of the products and likelihood of bridging the gap;

 (4) the interrelationship among the three preceding factors;

 (5) the extent of overlap among consumers of the parties' products;

 (6) the sophistication of the consumers;

 (7) whether there is actual confusion;

 (8) whether the senior user's mark is in fact descriptive of the junior use;

 (9) harm to the junior user and delay by the senior user; and

 (10) whether the senior user has previously been lax in protecting the mark.

*See Nabisco, Inc.,* 191 F.3d at 217–22; *Federal Express,* 201 F.3d at 176–77.

The Court has already found that Plaintiff's mark is inherently distinctive but that Plaintiff has not shown that the mark is famous or has acquired distinction in the marketplace outside the narrow market for stethoscopes and sphygmomanometers. The marks are somewhat similar, but

Plaintiff has not demonstrated proximity of the products in the market or the likelihood of bridging the gap. Due to the inadequate proof regarding the proximity of the products and the nature of the marketplace, the Court finds that on this record the interrelationship among the first three factors does not support a finding of dilution. For the same reason, the Court finds that the fifth factor, the overlap between the markets, does not favor Plaintiff. The Court has also noted the lack of evidence regarding the sophistication of the consumers and the weakness of the evidence regarding actual confusion. Here, where the mark in issue is entirely fanciful, the eighth factor is irrelevant. The Court has already determined that the ninth and tenth factors favor Defendants. Considering these findings in the context of the overall goal of the FTDA to protect the owner of a famous mark against dilution of the distinctive quality of the mark, *see* 15 U.S.C. § 1125(c), and the FTDA's definition of "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services," 15 U.S.C. § 1127, the Court concludes that Plaintiff has failed to carry its burden of adducing evidence sufficient to demonstrate a likelihood of success or sufficiently serious questions going to the merits of the issue of dilution under the FTDA.[21] Accordingly, the Court concludes that Plaintiff has not carried its burden to demonstrate its entitlement to the drastic relief of a preliminary injunction in connection with its federal trademark dilution claim.

### 3. New York anti-dilution statute

Under New York law, in order to demonstrate a likelihood of dilution by

---

**21.** Plaintiff's only argument with respect to irreparable harm on its FTDA claim is that such harm is presumed where dilution is likely. Since the Court has concluded that Plaintiff has failed to establish that dilution is likely, the Court likewise concludes that Plaintiff has not demonstrated irreparable harm.

blurring, a plaintiff must establish that the challenged use will dilute the "distinctive quality of a mark[.]" N.Y.Gen.Bus. Law § 360–*l* (formerly § 368–d). A claim under § 360–*l* must be based upon two elements. "First, plaintiff's mark must possess a distinctive quality capable of dilution.... Second, plaintiff must show a likelihood of dilution, ..." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1030 (2d Cir.1989) (internal citations omitted).

▇▇▇ With respect to the first element, it is true, as Plaintiff points out, that New York law does not require that a mark be famous to be entitled to protection from dilution. Nevertheless, the New York anti-dilution statute "protects only extremely strong marks[.]" *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir.1983) (citing *Allied [Maintenance Corp. v. Allied Mechanical Trades],* 42 N.Y.2d at 545–46, 399 N.Y.S.2d 628, 369 N.E.2d 1162; 1954 N.Y. Legis. Annual 49 (listing as examples of diluting tradenames: "Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, [and] Bulova gowns")). In considering the degree of blurring necessary to support a claim of dilution under New York law, the Second Circuit has found that there must be "some mental association between" the parties' marks, stating that "[t]his mental association may be created where the plaintiff's mark is very famous and therefore has a distinctive quality for a significant percentage of the defendant's market.... However, if a mark circulates only in a limited market, it is unlikely to be associated generally with the mark for a dissimilar product circulating elsewhere." *Mead Data,* 875 F.2d at 1031 (internal

citation and other citations omitted). Here, for reasons discussed in connection with Plaintiff's claims of trademark infringement, the Court finds that Plaintiff has not shown that its Tycos mark possesses a *distinctive quality capable of dilution* in the medical products market, outside of the market for stethoscopes and sphygmomanometers.

The second element is likelihood of dilution. In rejecting a state law blurring claim in *Sally Gee,* the Second Circuit found that the plaintiff "failed to prove that the product-evoking quality of its marks were likely to be weakened by" the use of the defendant's mark, noting that "fanciful though its marks may be, [plaintiff] must set forth some proof that its marks conjure up images of its [product] in the minds of the consuming public in order to establish associational qualities entitling it to protection from dilution." *Sally Gee,* 699 F.2d at 626.

In the present case, the record does not show the extent to which Plaintiff's mark is known outside the limited market of stethoscopes and sphygmomanometers and thus does not show that the use of the Tyco name is likely to blur Plaintiff's product identification in the medical products market. On this record, the Court finds that Plaintiff has not adduced sufficient evidence to support a finding of a likelihood of confusion or sufficiently serious questions going to the merits of its claim of a likelihood of dilution under § 360–*l*.[22] Accordingly, the Court concludes that Plaintiff has not carried its burden to demonstrate its entitlement to the drastic relief of a preliminary injunction in connection with its state law trademark dilution claim.[23]

---

22. The Court notes that the absence of a showing that Defendants acted in bad faith is a relevant factor under New York's anti-dilu-

tion law. *See Sally Gee,* 699 F.2d at 626 (citation omitted).

23. As noted with respect to Plaintiff's FTDA claim, Plaintiff's only argument with respect

## IV. CONCLUSION

After carefully reviewing the file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Plaintiff's motion for a preliminary injunction in connection with its claims of trademark dilution under both federal and state law is **DENIED;** and the Court further

**ORDERS** that Plaintiff's motion for a preliminary injunction in connection with its trademark infringement claim is **DENIED** with respect to those products in conjunction with which Defendants currently use the Tyco/Healthcare and Tyco trademarks, and is **GRANTED** with respect to Defendants' use of the Tyco/Healthcare and Tyco trademarks, or any other trademark using the word "Tyco," on any non-disposable medical products or medical instruments in conjunction with which Defendants do not currently use those marks.

**IT IS SO ORDERED.**

to irreparable harm is that such harm is presumed where dilution is likely. Since the Court has concluded that Plaintiff has failed to establish that dilution is likely, the Court likewise concludes that Plaintiff has not demonstrated irreparable harm.